REVISED NOVEMBER 2, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 99-10331

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

TIMOTHY JOE EMERSON,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Northern District of Texas

---

October 16, 2001

Before GARWOOD, DeMOSS and PARKER, Circuit Judges.

GARWOOD, Circuit Judge:

The United States appeals the district court's dismissal of the indictment of Defendant-Appellee Dr. Timothy Joe Emerson (Emerson) for violating 18 U.S.C. § 922(g)(8)(C)(ii). The district court held that section 922(g)(8)(C)(ii) was unconstitutional on its face under the Second Amendment and as applied to Emerson under the Due Process Clause of the Fifth Amendment. We reverse and remand.

## Facts and Proceedings Below

On August 28, 1998, Sacha Emerson, Emerson's wife, filed a petition for divorce in the 119th District Court of Tom Green County, Texas. The petition also requested, *inter alia*, a temporary injunction enjoining Emerson from engaging in any of twenty-nine enumerated acts. On September 4, 1998, Judge Sutton held a temporary orders evidentiary hearing. Sacha Emerson was represented by counsel while Emerson appeared *pro se*. There is no evidence that Emerson was unable (financially or otherwise) to retain counsel for the hearing or that he desired representation by counsel on that occasion. He announced ready at the beginning of the September 4 hearing. Almost all of Sacha Emerson's direct testimony concerned financial matters, but the following relevant exchange took place on direct examination by her attorney:

Q   You are here today asking the Court for temporary orders regarding yourself and your daughter; is that correct?

A   Yes.

Q   You have asked in these restraining orders regarding Mr. Emerson in that he not communicate with you in an obscene, vulgar, profane, indecent manner, in a coarse or offensive manner?

A   Yes.

Q   He has previous to today threatened to kill you; is that correct?

A   He hasn't threatened to kill me. He's threatened to kill a friend of mine.

Q   Okay. And he has threatened – he has made some

2

phone calls to you about that?

A    Yes.[1]

Emerson declined an opportunity to cross-examine Sacha and presented no evidence tending to refute any of her above quoted testimony or to explain his conduct in that respect.  In his testimony he stated in another connection, among other things, that he was suffering from "anxiety" and was not "mentally in a good state of mind."

On September 14, 1998, Judge Sutton issued a temporary order that included a "Temporary Injunction" which stated that Emerson "is enjoined from" engaging in any of twenty-two enumerated acts, including the following:

> "2. Threatening Petitioner in person, by telephone, or in writing to take unlawful action against any person."
> "4. Intentionally, knowingly, or recklessly causing bodily injury to Petitioner or to a child of either party."
> "5. Threatening Petitioner or a child of either party with imminent bodily injury."

The order provides that it "shall continue in force until the signing of the final decree of divorce or until further order of this court."  The September 14, 1998 order did not include any express finding that Emerson posed a future danger to Sacha or to

---

[1]The district court's opinion observes that "[d]uring the [September 4, 1998] hearing, Mrs. Emerson alleged that her husband threatened over the telephone to kill the man with whom Mrs. Emerson had been having an adulterous affair." *United States v. Emerson*, 46 F.Supp.2d 598, 599 (N.D. Tex. 1999).

his daughter Logan.[2]  There is nothing to indicate that Emerson ever sought to modify or challenge any of the provisions of the September 14, 1998 order.

On December 8, 1998, the grand jury for the Northern District of Texas, San Angelo division, returned a five-count indictment against Emerson.  The government moved to dismiss counts 2 through 5, which motion the district court subsequently granted.[3]  Count 1, the only remaining count and the count here at issue, alleged that Emerson on November 16, 1998, unlawfully possessed "in and affecting interstate commerce" a firearm, a Beretta pistol, while subject to the above mentioned September 14, 1998 order, in violation of 18 U.S.C. § 922(g)(8).  It appears that Emerson had purchased the pistol on October 10, 1997, in San Angelo, Texas, from a licensed firearms dealer.  Emerson does not claim that the

---

[2]On August 28, 1998, the day Sacha's petition was filed, Judge Sutton had issued an ex-parte temporary restraining order prohibiting Emerson from engaging in any of the 29 acts enumerated in Sacha's petition pending a hearing on Sacha's request for a temporary injunction.  These acts included all those quoted in the text above which the September 14, 1998 order enjoined Emerson from committing. The August 28, 1998 order stated that, after examining the petition, the court "finds that . . . unless [r]espondent . . . is immediately restrained from the commission of the acts hereinafter prohibited, [r]espondent will commit such acts before notice of the hearing on temporary injunction can be served and a hearing had." This August 28, 1998 order is not the order alleged in the indictment, and in any event it is not within the terms of § 922(g)(8)(A) which requires that the order have been "issued after a hearing of which such person received actual notice, and at which such  person had an opportunity to participate."

[3]The motion was apparently made because of problems with a witness. On February 25, 1999, the district court granted the government's motion.

4

pistol had not previously traveled in interstate or foreign commerce. It is not disputed that the September 14, 1998 order was in effect at least through November 16, 1998.

Emerson moved pretrial to dismiss the indictment, asserting that section 922(g)(8), facially and as applied to him, violates the Second Amendment and the Due Process Clause of the Fifth Amendment. He also moved to dismiss on the basis that section 922(g)(8) was an improper exertion of federal power under the Commerce Clause and that, in any case, the law unconstitutionally usurps powers reserved to the states by the Tenth Amendment. An evidentiary hearing was held on Emerson's motion to dismiss.

The district court granted Emerson's motions to dismiss. Subsequently, the district court issued an amended memorandum opinion reported at 46 F.Supp.2d 598 (N.D. Tex. 1999). The district court held that dismissal of the indictment was proper on Second or Fifth Amendment grounds, but rejected Emerson's Tenth Amendment and Commerce Clause arguments.

The government appealed. Emerson filed a notice of cross-appeal, which was dismissed by this Court. The government challenges the district court's dismissal on Second and Fifth Amendment grounds. Emerson defends the district court's dismissal on those grounds and also urges that dismissal was in any event proper under the Commerce Clause and on statutory grounds.

**Discussion**

I.   Construction of 18 U.S.C. § 922(g)(8)

18 U.S.C. § 922 provides in relevant part:

"(g) It shall be unlawful for any person-
....
(8) who is subject to a court order that-
    (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
    (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
    (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
    (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or
....
to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

Emerson argues that section 922(g)(8)(C)(ii) should be construed to require that the particular predicate court order include an explicit finding that the person enjoined posed a credible threat of violence to his spouse or child.  Emerson further argues that the statute must also be read to require that the predicate order be supported by sufficient evidence before the court entering it to sustain such a finding, so that the court in the criminal prosecution must examine the record in the proceeding before the court entering the predicate order and must acquit the

6

defendant in the criminal case if the evidence before the court entering the predicate order was not sufficient to sustain such a finding. It is, of course, our duty to construe a statute so as to avoid any serious constitutional questions. However, the statute must be susceptible to that construction, i.e. our construction must be fairly possible; the duty to avoid constitutional questions is not a license to rewrite the statute. *Jones v. United States*, 119 S.Ct. 1215, 1222 (1999); *Feltner v. Columbia Pictures Television, Inc.*, 118 S.Ct. 1279, 1283 (1998); *United States v. Albertini*, 105 S.Ct. 2897, 2902 (1985). "If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *Russello v. United States*, 104 S.Ct. 296, 299 (1983) (quoting *United States v. Turkette*, 101 S.Ct. 2524, 2527 (1981)). In addition, if uncertainty remains after an examination of the statute's text, its legislative history and the policies it advances, the rule of lenity requires this uncertainty to be resolved in favor of Emerson. *United States v. Prestenbach*, 230 F.3d 780, n.23 (5th Cir. 2000).

Turning first to Emerson's second statutory argument, there is nothing in the text of the statute to support it. Moreover, it is contrary to uniform construction of section 922(g) and its predecessors under which the courts have construed this and other similar subsections of section 922. *See, e.g., Lewis v. United*

7

*States*, 100 S.Ct. 915 (1980); *United States v. Chambers*, 922 F.2d 228, 232-40 (5th Cir. 1991). Just as *Lewis* observed that "nothing [in the statutory text] suggests any restriction on the scope of the term 'convicted,'" *id*. at 918, so also nothing in section 922(g)(8) suggests that the validity of the particular predicate court order may be inquired into in the section 922(g)(8) criminal prosecution. Moreover, this is consistent with the long standing federal rule that violation of an injunction that is subsequently invalidated may, at least so long as it cannot be characterized as having only a transparent or frivolous pretense to validity, be punished as criminal contempt. *See Chambers* at 239-40; *National Maritime Union v. Aquaslide 'N' Drive Corp.*, 737 F.2d 1395, 1399-1400 (5th Cir. 1984).[4]

We likewise reject the argument that section 922(g)(8) requires that the predicate order contain an express judicial finding that the defendant poses a credible threat to the physical safety of his spouse or child. If the requirements of 922(g)(8)(A) and (B) are fulfilled, then by its terms section 922(g)'s firearms disability attaches if *either* clause (C)(i) *or* clause (C)(ii) applies. Although an express judicial finding of future dangerousness pursuant to section 922(g)(8)(C)(i) is one way section 922(g)(8)'s firearms disability can attach, to construe

---

[4]The presently relevant portions of the September 14, 1998, order here cannot be characterized as having only a transparent or frivolous pretense to validity.

8

section 922(g)(8) as always requiring an express judicial finding would be to substitute the word "and" for the word "or" that appears at the end of 922(g)(8)(C)(i). If Congress intended to require an express judicial finding, it would have arranged the elements as 922(g)(8)(A)-(D) and used the word "and" rather than "or" to join them.

Notwithstanding the lack of textual ambiguity, Emerson maintains that we should either imply the express judicial finding requirement into section 922(g)(8) or at least recognize the lack of an express judicial finding as an affirmative defense to section 922(g)(8). He argues that, without the requirement of an express judicial finding, sections 922(g)(8)(B) and (C)(ii) are redundant while section 922(g)(8)(A) is rendered a nullity. While there is some overlap between section 922(g)(8)(B) and (C)(ii), each still has some independent scope in the statutory scheme. Section 922(g)(8)(B) broadly refers to orders that restrain harassing, stalking or threatening. It is quite possible that an order could surmount the section 922(g)(8)(B) hurdle and yet only fulfill one of the section 922(g)(8)(C) criteria. Congress obviously felt that if the order only "restrains" harassing, stalking, threatening, or otherwise causing fear of injury, an express judicial finding of a credible threat of violence was necessary. Section 922(g)(8)(B) and (C)(i). However, if the order "by its terms explicitly prohibits" the use, attempted use or threatened use of physical

9

force, no such express finding was necessary. Section 922(g)(8)(C)(ii). Thus, Congress affirmatively drew a distinction between orders "explicitly prohibiting" the actual, attempted or threatened physical attack and those merely "restraining" stalking or harassment. It is true that both sections embrace orders that proscribe threats, but this degree of congruence is insufficient to overcome the plain meaning of the text. Nor do we agree that the absence of a requirement of an express judicial finding renders section 922(g)(8)(A) a nullity.

Emerson also argues that the word "restrain", as used in 922(g)(8)(B), necessarily requires an express judicial finding that the defendant poses a credible threat of violence to his spouse or child. The argument is simply that both temporary and permanent injunctions traditionally require, in addition to notice and hearing, some express judicial finding supporting the court's order. While this may be generally true, it is not invariably the case that injunctions must contain such findings and, more importantly, the argument made does not overcome the fact that Congress specifically required notice and hearing in all section 922(g)(8) cases but affirmatively and specifically required an express finding only in cases governed by clause (C)(i). The crux of the matter is that we cannot imply in clause (C)(ii) an express finding requirement that is not stated in it *while* being affirmatively and specifically stated in clause (C)(i).

10

Relying on the legislative history of section 922(g)(8), Emerson and amicus the State of Alabama contend that all three versions of the bill (one from the House, two from the Senate) that went to the Conference Committee required an express judicial finding. They contend that the real purpose of section 922(g)(8)(C)(ii) is to close a "loophole" in section 922(g)(8) that would have prevented it from applying if the express judicial finding was not in the order itself, but instead, for example, in an accompanying memorandum. We find neither argument ultimately persuasive. Contrary to the assertions of Emerson and the State of Alabama, one of the Senate versions of the bill that went to the Conference Committee did authorize a firearms disability without any express judicial finding. This version resulted from amendment 1179 to S.1607, submitted by Senator Biden for Senator Wellstone on November 10, 1993. Amendment 1179 provided, in relevant part:

> "(8)(A) has been convicted in any court of an offense that–
> (i) involves the use, attempted use, or threatened use of physical force against a person who is a spouse, former spouse, domestic partner, child, or former child of the person; or
> (ii) by its nature, involves a substantial risk that physical force against a person who is a spouse, former spouse, domestic partner, child, or former child of the person may be used in the course of committing the offense; or
> (B) is required, pursuant to an order issued by any court in a case involving a person described in subparagraph (A), to refrain from any contact with or to maintain a minimum distance from that person, or to refrain from abuse, harassment, or stalking of that person."

139 Cong. Rec. S15638-03, *S15650. This language was sent to the

11

Conference Committee on November 24, 1993, and clearly contemplates a firearms disability without either a conviction or an express judicial finding of future dangerousness. 139 Cong. Rec. S17095-03, *S17174.[5] Emerson's contention that 922(g)(8)(C)(ii)'s presence in the statute cannot be explained by anything sent to the Conference Committee is unfounded. Similarly, there is nothing in the legislative history suggesting that Congress, or any of its committees or members, ever addressed, considered or had called to its or their attention the supposed "loophole" in the statutory scheme now put forth by Emerson.

Because the construction urged by Emerson is not fairly possible, we must decline his invitation to rewrite section 922(g)(8). Likewise, because section 922(g)(8) is not ambiguous, the rule of lenity provides no basis for relief.

II. Due Process Clause of the Fifth Amendment

The district court held that prosecution for violating section 922(g)(8) would deprive Emerson of his Fifth Amendment right to Due Process because: 1) Dr. Emerson did not know that possession of a firearm while being subject to the September 14, 1998 order was a crime; 2) section 922(g)(8) is an "obscure criminal provision" that would be difficult for Emerson to discover; 3) there is nothing inherently evil about possessing a firearm; and 4) Emerson had no

_____

[5]The reference in this proposed amendment's subparagraph (B) to "a person described in subparagraph (A)" plainly is to the "who is a spouse, former spouse, domestic partner, child, or former child" language of subparagraph (A).

reason to suspect that being subject to the September 14, 1998 order would criminalize otherwise lawful behavior. *United States v. Emerson*, 46 F.Supp.2d 598, 611-13. The district court relied upon *Lambert v. California*, 78 S.Ct. 240, 243 (1957), in which the Supreme Court struck down a Los Angeles law requiring resident felons to register with the city. The Supreme Court observed that: 1) the defendant had been prosecuted for passive activity; 2) the defendant was unaware of the need to register; 3) circumstances that would have prompted an inquiry into the necessity of registration were lacking; and 4) an average member of the community would not consider the punished conduct blameworthy. *Id*.

At the outset, we note that "[t]he sweep of the *Lambert* case has been limited by subsequent decisions of the Supreme Court, lest it swallow the general rule that ignorance of the law is no excuse." *United States v. Giles*, 640 F.2d 621, 628 (5th Cir. 1981). 18 U.S.C. § 924(a)(2) provides that the required *mens rea* for conviction under section 922(g) is knowledge ("Whoever knowingly violates subsection . . . (g) . . . of section 922 . . . ."). "Knowingly"–in contrast to at least some uses of "wilfully"–does not require that the defendant know that his actions are unlawful, but only that he know he is engaging in the activity that the legislature has proscribed. *Bryan v. United States*, 118 S.Ct. 1939, 1945-47 (1998). *Bryan* explained that *Staples v. United States*, 114 S.Ct. 1793 (1994), exemplifies this

13

distinction.  In *Staples*, the Supreme Court held that conviction for unlawful possession of a machine gun did not require knowledge that machine gun possession was unlawful, but only knowledge that the weapon possessed was a machine gun.  *Bryan*, 118 S.Ct. at 1946 (under *Staples* "[i]t was not, however, necessary to prove that the defendant knew that his possession was unlawful").  Here, there is no question that Emerson was aware that on November 16, 1998, he actively possessed a firearm of the kind covered by the statute while subject to the September 14, 1998 order or that he misapprehended the actual contents of that order.[6]

Moreover, Emerson filled out and signed BATF Form 4473 when, on October 10, 1997, he purchased the Beretta semi-automatic pistol referred to in Count 1.  This afforded notice to Emerson that so long as he was under a court order such as that of September 14,

---

[6]So far as the record reflects, this case does not present a situation where the defendant's firearm possession is merely incident to (and/or is simply passive pending initiation and completion of) a good faith effort to rid himself, as soon as after issuance of the disqualifying court order as reasonably practicable under the circumstances, of the continued possession of a previously possessed firearm.  Whether such possession is outside the intended scope of § 922(g)(8), or whether such circumstances constitute a defense akin to that of necessity, justification or the like, or whether some such result is constitutionally required (under the Second or Fifth or Eighth Amendments, or otherwise), is thus not now before us. *See, generally, e.g., United States v. Newcomb*, 6 F.3d 1129, 1133-38 (6th Cir. 1993) (preventing harm to others). *Cf. United States v. Gomez*, 81 F.3d 846, 850-54 (9th Cir. 1996) (self-defense; *United States v. Panter*, 688 F.2d 268, 269-72 (5th Cir. 1982) (same).  We also observe that the charged possession here was more than 60 days after the September 14, 1998 order.  There is no assertion that Emerson did not know of the order when it was entered or within a day or two thereafter.

14

1998, federal law prohibited his continued possession of that weapon.[7]   In *Giles,* we distinguished *Lambert* on this basis (as well as others), noting "Giles' situation, of course, is far different from that of Ms. Lambert, for he was directly confronted

---

[7]The front of the form contains a section 8 which consists of 11 separate questions (respectively labeled "a" through "i") each of which has an adjoining blank box in which the purchaser must fill in the answer "yes" or "no."   Question "8j" asks:
   "j.  Are you subject to a court order restraining you from harassing, stalking, or threatening an intimate partner or child of such partner?" (*See important Notice 4 and Definition 4.)*"

Emerson, correctly, filled in the answer "no" to each of questions 8b through 8k.
   Just below section 8 of the form, and just above where Emerson signed the form, is a five line certificate, all in bold faced and capital letters, which includes the statement: "I understand that a person who answers 'yes' to any of the questions 8b through 8k is prohibited from purchasing or possessing a firearm."
   The "important Notice 4 and Definition 4" to which question 8j refers the purchaser is set out on the back of the form as follows:
   "4.  Under 18 U.S.C. § 922 firearms may not be sold to or received by persons subject to a court order that: (A) was issued after a hearing of which the person received actual notice and had an opportunity to participate; (B) restrains such person from harassing, stalking or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child, or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury."

   We also note that paragraph (8) of § 922(g) became law in September 1994, P.L. 103-322, Sec. 110401(c), 108 Stat. 1796, 2014-2015, 2151, approximately three years prior to Emerson's acquisition of the firearm in question and approximately four years prior to the September 14, 1998 order.

with accurate written notice of the conduct proscribed by the statute [then § 922(h)(1)] when he filled out and signed a Form 4473 as part of each firearm purchase." *Giles*, 640 F.2d at 628. Finally, we agree with the district court that firearms ownership is not inherently evil or suspect and that thus a certain *mens rea* is required. *Staples*, 114 S.Ct. at 1799-1801. However, *Bryan* and *Staples* make clear that the necessary *mens rea* in this context does not require knowledge of the law but merely of the legally relevant facts. *Giles* rejects application of *Lambert* at least where, as here, there is the notice provided by the Form 4473. For these reasons, we hold that Emerson's case does not merit relief under *Lambert*, and that the district court erred when it granted Emerson's motion to dismiss the indictment as violating his Fifth Amendment Due Process rights on that basis.

III. Commerce Clause

The district court rejected Emerson's contention that, in enacting section 922(g)(8), Congress exceeded its power under the Commerce Clause. As the district court noted, this Court has held that, because section 922(g)(8) only criminalizes the possession of firearms or ammunition "in or affecting commerce" and the reception of firearms that have been "shipped or transported in interstate or foreign commerce", Congress did not exceed its Article I, Section 8 powers in enacting it. *United States v. Pierson*, 139 F.3d 501, 503 (5th Cir.), *cert. denied,* 119 S.Ct. 220 (1998). Accordingly,

16

the district court, as bound by this precedent as we are, did not err in denying Emerson's motion to dismiss the indictment on Commerce Clause grounds.[8]

IV.  Tenth Amendment

The district court held that congressional enactment of section 922(g)(8) did not violate the Tenth Amendment to the Constitution.  Finding no reference to this issue in Emerson's brief to this Court, we must consider his Tenth Amendment claim abandoned.

---

[8]Emerson assumed, for purposes of his pretrial motion to dismiss on Commerce Clause grounds, that the pistol had traveled into Texas in interstate or foreign commerce at some time prior to his October 10, 1997, purchase of it in Texas.  The government likewise so assumed. Neither party alleged, the record does not reflect, and the district court made no finding as to, when such travel in interstate or foreign commerce occurred.

Emerson did not contend below, and does not contend on appeal, that the pistol had not traveled in interstate or foreign commerce *after* the 1994 enactment of the current version of § 922(g)(8). We also note that Emerson's 1997 purchase of the pistol was apparently from a federally licensed firearms dealer, although any possible relevance of that to the issue of congressional Commerce Clause power has not been raised by either party here or below. *See United States v. Lopez*, 2 F.3d 1342, 1348 & n.9 (5th Cir. 1993), *affirmed,* 115 S.Ct. 1624 (1995).  Emerson's Commerce Clause challenge as presented below and on appeal, and the government's and the district court's response thereto, does not address either of those matters, and we do not address either of them.  Emerson has not demonstrated error in the district court's denial of his pretrial motion to dismiss under the Commerce Clause.

Even assuming, as we do, that the instant firearm traveled in interstate commerce after the September 1994 enactment of § 922(g)(8), and though we are bound by our prior precedent, it nevertheless appears to us that the founding generation would have regarded as clearly illegitimate any construction of the Commerce Clause which allowed federal prohibition of mere passive, non-commercial, personal possession of a firearm acquired in accordance with federal (as well as state) law which thereafter always remained within the state in which it was acquired.

17

V.   Second Amendment

The Second Amendment provides:

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed."

A.   Introduction and Overview of Second Amendment Models

The district court held that the Second Amendment recognizes the right of individual citizens to own and possess firearms, and declared that section 922(g)(8) was unconstitutional on its face because it requires that a citizen be disarmed merely because of being subject to a "boilerplate [domestic relations injunctive] order with no particularized findings." *Emerson*, 46 F.Supp.2d at 611.   The government opines that *stare decisis* requires us to reverse the district court's embrace of the individual rights model.   Amici for the government argue that even if binding precedent does not require reversal, the flaws in the district court's Second Amendment analysis do.

In the last few decades, courts and commentators have offered what may fairly be characterized as three different basic interpretations of the Second Amendment.   The first is that the Second Amendment does not apply to individuals; rather, it merely recognizes the right of a state to arm its militia.[9]   This "states'

---

[9]*See* Michael A. Bellesiles, *The Second Amendment in Action*, 76 CHI.-KENT L. REV. 61 (2000); Carl T. Bogus, *The History and Politics of Second Amendment Scholarship: A Primer*, 76 CHI.-KENT L. REV. 3 (2000); Carl T. Bogus, *The Hidden History of the Second Amendment*, 31 U.C. DAVIS L.REV. 309 (1998); Keith A. Ehrman & Dennis A. Henigan, *The Second*

18

rights" or "collective rights" interpretation of the Second

Amendment has been embraced by several of our sister circuits.[10]

---

*Amendment in the Twentieth Century: Have You Seen Your Militia Lately?*, 15 U. DAYTON L. REV. 5 (1989); Paul Finkelman, *"A Well Regulated Militia": The Second Amendment in Historical Perspective*, 76 CHI.-KENT L. REV. 195 (2000); Steven J. Heyman, *Natural Rights and the Second Amendment*, 76 CHI.-KENT L. REV. 237 (2000); H. Richard Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

Not every proponent of this model conceives of it in exactly the same way. For example, Heyman and Uviller argue that the Second Amendment simply guarantees that the federal government will not do anything to destroy the militia.

[10]In *Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir. 1995), a citizen brought suit under 42 U.S.C. § 1983 against state officials for violating, *inter alia*, her Second Amendment rights by denying her application to purchase a handgun. After stating that "[t]he Second Amendment does not apply to the states," *id*. at 123, the court goes on to observe that "the Second Amendment preserves a collective, rather than individual, right." *Id*. at 124.

In *United States v. Warin*, 530 F.2d 103, 106 (6th Cir. 1976), also discussed in note 19, *infra*, the Sixth Circuit stated: "'Since the Second Amendment right "to keep and bear Arms" applies only to the right of the State to maintain a militia and not to the individual's right to bear arms, there can be no serious claim to any express constitutional right of an individual to possess a firearm.'" *Id*. (quoting *Stevens v. United States*, 440 F.2d 144, 149 (6th Cir. 1971)).

In *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999), a police officer convicted of a misdemeanor crime of domestic violence was fired because, under 18 U.S.C. § 922(g)(9), he could no longer possess a firearm and was, as a result, unable to perform his duties. He brought suit against the city officials and challenged the constitutionality of § 922(g)(9) on, *inter alia*, Second Amendment grounds. The Seventh Circuit rejected the challenge, noting that the Second Amendment's introductory clause "suggests" that it "inures not to the individual but to the people collectively, its reach extending so far as is necessary to protect their common interest in protection by a militia." *Id.* at 710. Despite the collective nature of the Second Amendment, the court found the plaintiff had standing to mount his Second Amendment challenge. *Id.* at 711. The court also said that the Second Amendment was not violated because under no "plausible set of facts" would "the viability and efficacy of state militias . . . be undermined by prohibiting those convicted of perpetrating domestic

The government commended the states' rights view of the Second Amendment to the district court, urging that the Second Amendment does not apply to individual citizens.

Proponents of the next model admit that the Second Amendment recognizes some limited species of individual right. However, this supposedly "individual" right to *bear* arms can only be exercised by members of a functioning, organized state militia who bear the arms while and as a part of actively participating in the organized militia's activities. The "individual" right to *keep* arms only applies to members of such a militia, and then only if the federal and state governments fail to provide the firearms necessary for such militia service. At present, virtually the only such organized and actively functioning militia is the National Guard, and this has been the case for many years. Currently, the federal government provides the necessary implements of warfare, including firearms, to the National Guard, and this likewise has long been the case. Thus, under this model, the Second Amendment poses no obstacle to the wholesale disarmament of the American people. A

---

violence from possessing weapons in or affecting interstate commerce." *Id*.

*Hickman v. Block*, 81 F.3d 98, 99 (9th Cir. 1996), involved another § 1983 suit by a citizen against state officials who denied his application for a concealed weapons permit. The Ninth Circuit decided to "follow our sister circuits in holding that the Second Amendment is a right held by the states, and does not protect the possession of a weapon by a private citizen." *Id*. at 101. Thus, the plaintiff's lack of standing was dispositive, though the court did note that the Second Amendment "is not incorporated against the states." *Id.* at 103 n.10.

number of our sister circuits have accepted this model, sometimes referred to by commentators as the sophisticated collective rights model.[11] On appeal the government has abandoned the states' rights

---

[11]In *Cases v. United States*, 131 F.2d 916, 923 (1st Cir. 1942), also discussed in note 19, *infra*, the First Circuit concluded that the Second Amendment was not infringed because there was no evidence that the defendant "was or ever had been a member of any military organization or that his use of the weapon . . . was in preparation for a military career" and the evidence showed he was "on a frolic of his own and without any thought or intention of contributing to the efficiency of the well regulated militia." *Id.* While the First Circuit did not explicitly adopt the sophisticated collective rights model, its analysis is in many respects consonant with it.

In *United States v. Rybar*, 103 F.3d 273, 286 (3d Cir. 1996), the Third Circuit held that Rybar's membership in the general, unorganized militia established by 10 U.S.C. § 311(a) did not cause his possession of a machine gun to be so connected with militia activity that the Second Amendment applied. While *Rybar* was not clear about whether it was adopting the states' rights view or the sophisticated collective rights view, it seems more consistent with the latter.

In *United States v. Hale*, 978 F.2d 1016 (8th Cir. 1992), the Eighth Circuit found it unnecessary to commit to either the states' rights or the sophisticated collective rights model of the Second Amendment. The court proclaimed that "[c]onsidering this history, we cannot conclude that the Second Amendment protects the individual possession of military weapons." *Id*. at 1019. Yet, the court went on to consider whether the defendant's actual possession of machine guns was "reasonably related to the preservation of a well regulated militia." *Id.* at 1020. Like the Third Circuit in *Rybar,* the Eighth Circuit held that membership in an unorganized militia did not satisfy the reasonable relationship test. The court felt that unless the reasonable relationship test was satisfied, it was "irrelevant" whether the Second Amendment was collective or individual in nature. *Id*. However, the court's inquiry into the nature of the defendant's possession of the machine guns is more compatible with the sophisticated collective rights model.

*United States v. Oakes*, 564 F.2d 384 (10th Cir. 1977), is similar to *Rybar*. In *Oakes* the Tenth Circuit first rebuffed the individual rights view of the Second Amendment, then rejected defendant's argument that, because he was "technically" a member of the Kansas militia, as Kansas law defined its militia to include all able-bodied male citizens between ages 21 and 45, his possession of a machine gun preserved the effectiveness of the militia such that the Second Amendment applied. The court did not specify whether the Second Amendment was an individual right of extremely limited scope or whether it protected only states

model and now advocates the sophisticated collective rights model.

The third model is simply that the Second Amendment recognizes the right of individuals to keep and bear arms. This is the view advanced by Emerson and adopted by the district court. None of our sister circuits has subscribed to this model, known by commentators as the individual rights model or the standard model. The individual rights view has enjoyed considerable academic endorsement, especially in the last two decades.[12]

---

rather than individuals; however, the court's willingness to address the defendant's state militia argument is more in accord with the sophisticated collective rights model.

*United States v. Wright*, 117 F.3d 1265 (11th Cir. 1997), is similar to, and relied upon, *Hale*. The court held that the defendant's membership in Georgia's "unorganized militia"(defined as all able-bodied males between ages 17 and 45 not in the organized or retired militia–or national guard–or on the reserve list) did not render his possession of machine guns and pipe bombs so related to the preservation of a well regulated militia that it was necessary to determine whether the Second Amendment "creates" a collective or individual right. *Id.* at 1273-74 & n.18. The court also stated that "[t]he possibility that in responding to a future crisis state authorities might seek the aid of members of the unorganized militia does not speak to the militia's current state of regulation." Again, this approach is consistent with the sophisticated states' rights model.

For further discussion of the sophisticated collective rights model, see Robert J. Cottrol & Raymond T. Diamond, *The Fifth Auxiliary Right*, 104 YALE L. J. 995, 1003-1004 (1995) and Nelson Lund, *The Ends of Second Amendment Jurisprudence: Firearms Disabilities and Domestic Violence Restraining Orders*, 4 TEX. REV. L. & POL. 157, 184-86 (1999).

[12]*See* Scott Bursor, *Toward a Functional Framework for Interpreting the Second Amendment*, 74 TEXAS L. REV. 1125 (1996); Robert J. Cottrol & Raymond T. Diamond, *The Fifth Auxiliary Right*, 104 YALE L. J. 995 (1995); Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA. L. REV. 65 (1983); Stephen P. Halbrook, *The Right of the People or the Power of the State: Bearing Arms, Arming Militias, and the Second Amendment*, 26 VAL. U. L. REV. 131 (1991); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear*

22

We now turn to the question of whether the district court erred in adopting an individual rights or standard model as the basis of its construction of the Second Amendment.

B.    *Stare Decisis* and *United States v. Miller*

The government steadfastly maintains that the Supreme Court's decision in *United States v. Miller*, 59 S.Ct. 816 (1939), mandated acceptance of the collective rights or sophisticated collective rights model, and rejection of the individual rights or standard model, as a basis for construction of the Second Amendment.  We disagree.

Only in *United States v. Miller* has the Supreme Court rendered any holding respecting the Second Amendment as applied to the federal government.[13]  There, the indictment charged the defendants

---

*Arms"*, 49 LAW & CONTEMP. PROBS. 151 (1986); Don B. Kates, Jr., *The Second Amendment and the Ideology of Self-Protection*, 9 CONST. COMM. 87 (1992);  Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1983); Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L. J. 637 (1989); Nelson Lund, *The Ends of Second Amendment Jurisprudence: Firearms Disabilities and Domestic Violence Restraining Orders*, 4 TEX. REV. L. & POL. 157 (1999); Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 GA. L. REV. 1 (1996); Glenn H. Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461 (1995); Robert E. Shalhope, *The Ideological Origins of the Second Amendment*, 69 J. AM. HIST. 599 (1982); William Van Alstyne, *The Second Amendment and the Personal Right to Arms*, 43 DUKE L. J. 1236 (1994); Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. REV. 793 (1998).

[13]In *United States v. Cruikshank*, 23 L.Ed. 588 (1875), the Court held that the Second Amendment "is one of the amendments that has no other effect than to restrict the powers of the National Government." *Id*. at 592.  In *Presser v. Illinois*, 6 S.Ct. 580, 584 (1886), the Court,

23

with transporting in interstate commerce, from Oklahoma to Arkansas, an unregistered "Stevens shotgun having a barrel less than 18 inches in length" without having the required stamped written order, contrary to the National Firearms Act.[14] The defendants filed a demurrer challenging the facial validity of the indictment on the ground that "[t]he National Firearms Act . . . offends the inhibition of the Second Amendment," and "[t]he District Court held that section 11 of the Act [proscribing interstate transportation of a firearm, as therein defined, that lacked registration or a stamped order] violates the Second Amendment. It accordingly sustained the demurrer and quashed the indictment." *Id.* at 817-18. The government appealed, and we have

---

reaffirming *Cruikshank* and citing *Barron v. Baltimore*, 8 L.Ed. 672 (1833), held that the Second "amendment is a limitation only upon the power of congress and the national government, and not upon that of the state." And, in *Miller v. Texas*, 14 S.Ct. 874 (1894), the Court held, with respect to "the second and fourth amendments" that "the restrictions of these amendments operate only upon the federal power, and have no reference whatever to proceedings in state courts," citing *Barron v. Baltimore* and *Cruikshank*. As these holdings all came well before the Supreme Court began the process of incorporating certain provisions of the first eight amendments into the Due Process Clause of the Fourteenth Amendment, and as they ultimately rest on a rationale equally applicable to all those amendments, none of them establishes any principle governing any of the issues now before us.

[14]The Court's opinion quotes the entire indictment, *id*. at 816, and likewise quotes all the relevant provisions of the National Firearms Act (then codified at 26 U.S.C. §§ 1132 et seq.), including the definition (in its section 1) of a "firearm" as including "a shotgun or rifle having a barrel of less than eighteen inches in length." *Id*. n.1.

24

examined a copy of its brief.[15]  The *Miller* defendants neither filed

any brief nor made any appearance in the Supreme Court.

The government's Supreme Court brief "[p]reliminarily" points

out that:

> ". . . the National Firearms Act does not apply to all
> firearms but only to a limited class of firearms.  The
> term 'firearm' is defined in Section 1 of the Act. . . to
> refer only to 'a shotgun or rifle having a barrel of less
> than 18 inches in length, or any other weapon, except a
> pistol or revolver, from which a shot is discharged by an
> explosive if such weapon is capable of being concealed on
> the person, or a machine gun, and includes a muffler or
> silencer for any firearm whether or not such firearm is
> included within the foregoing definition.'" (*id.* at 6).

In this connection the brief goes on to assert that it is

"indisputable that Congress was striking not at weapons intended

for legitimate use but at weapons which form the arsenal of the

gangster and the desperado" (*id.* at 7) and that the National

Firearms Act restricts interstate transportation "of only those

weapons which are the tools of the criminal" (*id.* at 8).

The government's brief thereafter makes essentially *two* legal

arguments.

*First*, it contends that the right secured by the Second

---

[15]The demurrer further urged that the National Firearms Act was also unconstitutional because it was "not a revenue measure but an attempt to usurp police power reserved to the States." *Miller* at 817. The district court did not address this contention.  The Supreme Court dismissed it as "plainly untenable," citing *Sonzinksky v. United States*, 57 S.Ct. 554 (1937), and several cases "under the Harrison Narcotic Act," including *Nigro v. United States*, 48 S.Ct. 388 (1927).  *Miller* at 818.  The government's brief addressed only the issue of whether section 11 of the National Firearms Act contravened the Second Amendment.

25

Amendment is "only one which exists where the arms are borne in the militia or some other military organization provided for by law and intended for the protection of the state."  *Id*. at 15.  This, in essence, is the sophisticated collective rights model.

The *second* of the government's two arguments in *Miller* is reflected by the following passage from its brief:

> "While some courts have said that the right to bear arms includes the right of the individual to have them for the protection of his person and property as well as the right of the people to bear them collectively (*People v. Brown*, 253 Mich. 537; *State v. Duke*, 42 Tex. 455), the cases are unanimous in holding that the term "arms" as used in constitutional provisions refers only to those weapons which are ordinarily used for military or public defense purposes and does not relate to those weapons which are commonly used by criminals.  Thus in *Aymette v. State* [2 Humph., Tenn. 154 (1840)], *supra*, it was said (p. 158):
>
>> 'As the object for which the right to keep and bear arms is secured, is of general and public nature, to be exercised by the people in a body, for their *common defence*, so the *arms*, the right to keep which is secured, are such as are usually employed in civilized warfare, and that constitute the ordinary military equipment.  If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority.  They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin.  These weapons would be useless in war.  They could not be employed advantageously in the common defence of the citizens.  The right to keep and bear them, is not, therefore, secured by the constitution.'"  (*Id*. at 18-19).[16]

---

[16]The government's *Miller* brief (pp. 12-14) also quotes at length from *Aymette* at pp. 156-57 as background support for its *first* argument

26

The government's *Miller* brief then proceeds (at pp. 19-20) to cite

various other state cases, and *Robertson v. Baldwin*, 17 S.Ct. 326,

329 (1897),[17] in support of its *second* argument, and states:

---

(namely that the Second Amendment protects arms bearing only where it occurs during actual militia service).  However, while some of the *Aymette* language quoted tends in that direction, the actual holding of that case appears to rest on the basis stated in the quotation set out in the text above.  In *Aymette* the defendant appealed his conviction of violating the statute making it a misdemeanor to "wear any bowie knife . . . under his clothes, or . . . concealed about his person."  The evidence showed that the defendant, with "a bowie-knife concealed under his vest," went into a hotel looking for an individual he said he intended to kill.  He contended on appeal that the conviction violated the provision of the Tennessee constitution declaring "that the free white men of this State have a right to keep and bear arms for their common defence." The court emphasized the presence and significance of the word "common."  But although it was obvious from the facts recited that the defendant was not engaged in any character of militia service on the occasion in question, but was rather engaged only in an entirely personal activity of his own, the *Aymette* court did not make this a ground for its decision.  Rather, it appears to have affirmed on the basis that [t]he Legislature . . . have a right to prohibit the wearing or keeping weapons . . . which are not usual in civilized warfare, or would not contribute to the common defence" and, alternatively, that "the Legislature may prohibit such manner of wearing [arms] as would never be resorted to by persons engaged in the common defence." *Id*. at 159.

[17]In *Robertson* the Court, in upholding the constitutionality of the federal statute authorizing the apprehension, imprisonment and return of deserting merchant seamen, stated, in the passage obviously referred to in the government's *Miller* brief, as follows (17 S.Ct. at 329):
> ". . . the first 10 amendments to the constitution, commonly known as the 'Bill of Rights,' were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case.  In incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed. *Thus*, the *freedom of speech and of the press (article 1)* does not permit the publication of libels, blasphemous or indecent

27

"That the foregoing cases conclusively establish that the Second Amendment has relation only to the right of the people to keep and bear arms for lawful purposes and does not conceivably relate to weapons of the type referred to in the National Firearms Act cannot be doubted. Sawed-off shotguns, sawed-off rifles and machine guns are clearly weapons which can have no legitimate use in the hands of private individuals."

Thereafter, the government's brief in its "conclusion" states:

". . . we respectfully submit that Section 11 of the National Firearms Act does not infringe 'the right of the people to keep and bear arms' secured by the Second Amendment."

*Miller* reversed the decision of the district court and "remanded for further proceedings." *Id*. at 820. We believe it is entirely clear that the Supreme Court decided *Miller* on the basis of the government's *second* argument–that a "shotgun having a barrel of less than eighteen inches in length" as stated in the National Firearms Act is not (or cannot merely be assumed to be) one of the

---

articles, or other publications injurious to public morals or private reputation; *the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons*; the provision that no person shall be twice put *in jeopardy (article 5)* does not prevent a second trial, if upon the first trial the jury failed to agree, or if the verdict was set aside upon the defendant's motion . . . nor does the provision of the same article that *no one shall be a witness against himself* impair his obligation to testify, if a prosecution against him be barred by the lapse of time, a pardon, or by statutory enactment . . . Nor does the provision that an accused person shall be *confronted with the witnesses against him* prevent the admission of dying declarations, or the depositions of witnesses who have died since the former trial." (emphasis added)

The *Miller* opinion cites *Robertson*. *Miller,* 59 S.Ct. at 820 n.3.

28

"Arms" which the Second Amendment prohibits infringement of the right of the people to keep and bear–and *not* on the basis of the government's *first* argument (that the Second Amendment protects the right of the people to keep and bear *no* character of "arms" when not borne in actual, active service in the militia or some other military organization provided for by law"). *Miller* expresses its holding as follows:

> "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an* instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. *Aymette v. State of Tennessee*, 2 Humph., Tenn. 154, 158." *Id*. at 818 (emphasis added).

Note that the cited page of *Aymette* (p. 158) is the page from which the government's brief quoted in support of its *second* argument (see text at call for note 16 *supra*).[18]

Nowhere in the Court's *Miller* opinion is there any reference to the fact that the indictment does not remotely suggest that either of the two defendants was ever a member of any organized, active militia, such as the National Guard, much less that either

---

[18]We also observe that the *Miller* opinion's above reference in quotation marks to a shotgun "'having a barrel of less than eighteen inches in length'" is a quotation from section 1 of the National Firearms Act, not from the indictment (which refers to "a double barrel 12-gauge Stevens shotgun having a barrel less than 18 inches in length").

29

was engaged (or about to be engaged) in any actual military service or training of such a militia unit when transporting the sawed-off shotgun from Oklahoma into Arkansas. Had the lack of such membership or engagement been a ground of the decision in *Miller*, the Court's opinion would obviously have made mention of it. But it did not.[19]

---

[19]We note that Justice Thomas, in his concurring opinion in *Printz v. United States*, 117 S.Ct. 2365, 2386 n.1 (1997), remarked that "[i]n *Miller*, we determined that the Second Amendment did not guarantee a citizen's right to possess a sawed-off shotgun because that weapon had not been shown to be 'ordinary military equipment' that could 'contribute to the common defense.' The Court did not, however, attempt to define, or otherwise construe, the substantive right protected by the Second Amendment."

Further, in *Cases v. United States*, 131 F.2d 916, 922 (1st Cir. 1942), the First Circuit interpreted *Miller* as resting entirely on the type of weapon involved not having any reasonable relationship to preservation or efficiency of a well regulated militia. The *Cases* court, however, stated that "we do not feel that the Supreme Court in this case [*Miller*] was attempting to formulate a general rule applicable to all cases. The rule which it laid down was adequate to dispose of the case before it and that we think was as far as the Supreme Court intended to go." *Id*., 131 F.2d at 922. *Cases* thereafter observes:

> "Considering the many variable factors bearing upon the question it seems to us impossible to formulate any general test by which to determine the limits imposed by the Second Amendment but that each case under it, like cases under the due process clause, must be decided on its own facts and the line between what is and what is not a valid federal restriction pricked out by decided cases falling on one side or the other of the line." *Id*.

*Cases* then goes on, without further analysis or citation of authority, to conclude that although the weapon there involved (a .38 caliber revolver) "may be capable of military use, or . . . familiarity with it . . . of value in training a person to use a comparable weapon of military type," nevertheless the Second Amendment was not infringed because "there is no evidence that the appellant was or ever had been a member of any military organization or that his use of the weapon . . . was in preparation for a military career" but he was rather "simply on a frolic of his own and without any thought or intention of contributing to the efficiency of the well regulated militia which the

30

Nor do we believe that any other portion of the *Miller* opinion supports the sophisticated collective rights model.

Just after the above quoted portion of its opinion, the *Miller* court continued in a separate paragraph initially quoting the militia clauses of article 1, § 8 (clauses 15 and 16)[20] and concluding:

> "With obvious purpose to assure the continuation and render possible the effectiveness of such forces [militia] the declaration and guarantee of the Second Amendment were made.  It must be interpreted and applied

---

Second Amendment was designed to foster . . . ."  *Id.* at 922-23.

In *United States v. Warin*, 530 F.2d 103 (6th Cir. 1976), the court (rejecting a Second Amendment challenge to a conviction for possessing an unregistered 7 ½ inch barrel submachine gun contrary to the National Firearms Act), though concluding that "'the Second Amendment right' 'to keep and bear arms' applies only to the right of the State to maintain a militia and not to the individual's right to bear arms,'" nevertheless recognized that this conclusion was not based on *Miller*, stating that *Miller* "did not reach the question of the extent to which a weapon which is 'part of the ordinary military equipment' or whose 'use could contribute to the common defense' may be regulated" and agreeing with *Cases* "that the Supreme Court did not lay down a general rule in *Miller*."  *Id.*, 530 F.2d at 105-06.  The court also stated that the Second Amendment, even if it protected individual rights, "does not constitute an absolute barrier to the congressional regulation of firearms," noting that "even the First Amendment has never been treated as establishing an absolute prohibition against limitations on the rights guaranteed therein."  *Id.* at 107.

[20]Article 1, § 8 commences "The Congress shall have Power," and states in clauses 15 and 16:
"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;"

31

with that end in view."  *Id*. at 818.

*Miller* then proceeds to discuss what was meant by the term

"militia," stating in part:

> "The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators.  These show plainly enough that *the Militia comprised all males physically capable of acting in concert for the common defense*. . . . ordinarily when called for service these men were expected to appear *bearing arms supplied by themselves* and of the kind in common use at the time.
> . . .
> "The American Colonies In the 17th Century," Osgood, Vol. 1, ch. XIII, affirms in reference to the early system of defense in New England–
> "In all the colonies, as in England, the militia system was based on the principle of the assize of arms.  This implied the *general obligation of all adult male inhabitants to possess arms*, and, with certain exceptions, to cooperate in the work of defence.'" *Id*. at 818 (emphasis added).
> "The General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142), provided for the organization and government of the Militia.  It directed that the Train Band should 'contain *all able bodied men*, from *sixteen to forty* years of age, and the Alarm List, *all other men under sixty* years of age, * * *.'" *Id*. at 819 (emphasis added).

These passages from *Miller* suggest that the militia, the assurance

of whose continuation and the rendering possible of whose

effectiveness *Miller* says were purposes of the Second Amendment,

referred to the generality of the civilian male inhabitants

throughout their lives from teenage years until old age and to

their personally keeping their own arms, and not merely to

individuals during the time (if any) they might be actively engaged

32

in actual military service or only to those who were members of special or select units.

We conclude that *Miller* does not support the government's collective rights or sophisticated collective rights approach to the Second Amendment. Indeed, to the extent that *Miller* sheds light on the matter it cuts against the government's position. Nor does the government cite any other authority binding on this panel which mandates acceptance of its position in this respect.[21]

---

[21]The government relies on language in a footnote in *Lewis v. United States*, 100 S.Ct. 915, 921 n.8 (1980), stating with respect to the then felon-in-possession statute (former 18 U.S.C. App. § 1202(a)(1)):

"These legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties. *See United States v. Miller*, . . ., 59 S.Ct. 816, 818 . . . (1939) (the Second Amendment guarantees no right to keep and bear a firearm that does not have "some reasonable relationship to the preservation or efficiency of a well regulated militia")."

This does not suggest a collective rights or sophisticated collective rights approach to the Second Amendment any more than does *Miller* itself. We also note that recognition that the Second Amendment does not prohibit legislation such as former § 1202(a)(1) is in no way inconsistent with an individual rights model. *See, e.g., Robertson v. Baldwin*, 17 S.Ct. 326, 329 (1897) (quoted in note 17, *supra*) (bill of rights protections are not absolutes but subject to exceptions, so the First Amendment does not permit the publication of libels, the Second Amendment "is not infringed by laws prohibiting the carrying of concealed weapons," the double jeopardy clause does not preclude retrial where the jury fails to agree, the confrontation clause does not exclude dying declarations, etc.). *See also* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."); Stephen P. Halbrook, *What the Framers Intended:* A Linguistic Analysis of the Right to "Bear Arms", 49 Law & Contemp. Probs. 151 (1986) ("violent criminals,

However, we do not proceed on the assumption that *Miller* actually accepted an individual rights, as opposed to a collective or sophisticated collective rights, interpretation of the Second Amendment. Thus, *Miller* itself does not resolve that issue.[22] We turn, therefore, to an analysis of history and wording of the Second Amendment for guidance. In undertaking this analysis, we are mindful that almost all of our sister circuits have rejected any individual rights view of the Second Amendment. However, it respectfully appears to us that all or almost all of these opinions seem to have done so either on the erroneous assumption that *Miller* resolved that issue or without sufficient articulated examination of the history and text of the Second Amendment.

---

children, and those of unsound mind may be deprived of firearms . . . ."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("Nor does it seem that the Founders considered felons within the common law right to arms or intended to confer any such right upon them."). We further observe that *Lewis* presented no Second Amendment challenge to the § 1202(a)(1) conviction and the Second Amendment was not at issue there.

The government also cites in this connection our decisions in *United States v. Williams*, 446 F.2d 486 (5th Cir. 1971), and *United States v. Johnson*, 441 F.2d 1134 (5th Cir. 1971), but these National Firearms Act unregistered sawed-off shotgun prosecutions do no more than apply *Miller* to virtually identical facts and do not adopt or suggest that *Miller* adopted a collective rights or sophisticated collective rights approach to the Second Amendment.

[22]There is no contention here that the Beretta pistol possessed is a kind or type of weapon that is neither "any part of the ordinary military equipment" nor such "that its use could contribute to the common defense" within the language of *Miller* (nor that it is otherwise within the kind or type of weapon embraced in the government's second *Miller* argument, e.g., "weapons which can have no legitimate use in the hands of private individuals" so as to be categorically excluded from the scope of the Second Amendment under *Miller's* holding).

C.   Text

We begin construing the Second Amendment by examining its text: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.

1.   Substantive Guarantee

a.   "People"

The states rights model requires the word "people" to be read as though it were "States" or "States respectively."  This would also require a corresponding change in the balance of the text to something like "to provide for the militia to keep and bear arms." That is not only far removed from the actual wording of the Second Amendment, but also would be in substantial tension with Art. 1, § 8, Cl. 16 (Congress has the power "To provide for . . . arming . . . the militia. . ."). For the sophisticated collective rights model to be viable, the word "people" must be read as the words "members of a select militia".[23]  The individual rights model, of course, does not require that any special or unique meaning be attributed to the word "people."  It gives the same meaning to the words "the people" as used in the Second Amendment phrase "the

---

[23]As noted below in our discussion of the history of the Second Amendment, many Americans at this time not only feared a standing army but also a select militia, a militia comprised of only a relatively few selected individuals (perhaps the youngest and fittest) who were more frequently and better trained and equipped than the general, unorganized militia.  Such a select militia would be analogous to today's National Guard.

right of the people" as when used in the exact same phrase in the contemporaneously submitted and ratified First and Fourth Amendments.

There is no evidence in the text of the Second Amendment, or any other part of the Constitution, that the words "the people" have a different connotation within the Second Amendment than when employed elsewhere in the Constitution. In fact, the text of the Constitution, as a whole, strongly suggests that the words "the people" have precisely the same meaning within the Second Amendment as without. And, as used throughout the Constitution, "the people" have "rights" and "powers," but federal and state governments only have "powers" or "authority", never "rights."[24] Moreover, the

_____

[24]*See* U.S. CONST. Art. I, § 1, Cl. 1 ("[a]ll legislative Powers herein granted shall be vested in a Congress of the United States . . . ."); Art I, § 8, Cl. 16 ("reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."); Art. II, § 1, Cl. 1 ("The executive Power shall be vested in a President of the United States of America."); Art. III, § 1, Cl. 1 ("The judicial Power of the United States, shall be vested in one supreme Court . . . ."); amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or *the right of the people* peaceably to assemble, and to petition the Government for a redress of grievances.") (emphasis added); amend. II ("[a] well regulated Militia, being necessary to the security of a free State, *the right of the people* to keep and bear Arms, shall not be infringed.") (emphasis added); amend. IV ("*The right of the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.") (emphasis added); amend. IX ("[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."); amend. X ("[t]he powers not delegated to the United

36

Constitution's text likewise recognizes not only the difference between the "militia" and "the people" but also between the "militia" which has not been "call[ed] forth" and "the militia, when in actual service."[25]

Our view of the meaning of "the people," as used in the Constitution, is in harmony with the United States Supreme Court's pronouncement in *United States v. Verdugo-Urquidez*, 110 S.Ct. 1056, 1060-61 (1990), that:

> "'[T]he people' seems to have been a term of art employed in select parts of the Constitution. The Preamble declares that the Constitution is ordained and established by 'the People of the United States.' The Second Amendment protects 'the right of the people to keep and bear Arms,' and the Ninth and Tenth Amendments provide that certain rights and powers are retained by
>
> and reserved to 'the people.' While this textual exegesis is by no means conclusive, it suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of people who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." (citations omitted)

---

States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

It is also plain that the First Congress knew full well how to distinguish between "the people" and the states, e.g. amend. X.

[25]*See* U.S. CONST. Art. I, § 8, Cl. 15 ("[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"); amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentation or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger . . . .").

Several other Supreme Court opinions speak of the Second Amendment in a manner plainly indicating that the right which it secures to "the people" is an individual or personal, not a collective or quasi-collective, right in the same sense that the rights secured to "the people" in the First and Fourth Amendments, and the rights secured by the other provisions of the first eight amendments, are individual or personal, and not collective or quasi-collective, rights. *See, e.g., Planned Parenthood v. Casey*, 112 S.Ct. 2791, 2805 (1992); *Moore v. City of East Cleveland*, 97 S.Ct. 1932, 1937 (1977);[26] *Robertson v. Baldwin*, *supra* (see quotation in note 17 *supra*); *Scott v. Sandford*, 60 U.S. (19 How.) 393, 417, 450-51, 15 L.Ed. 691, 705, 719 (1856). *See also* Justice Black's concurring opinion in *Duncan v. Louisiana*, 88 S.Ct. 1444,

---

[26]The cited portions of *Casey* and *Moore* quote with approval from Justice Harlan's dissenting opinion in *Poe v. Ullman*, 81 S.Ct. 1752, 1776-77 (1961), the following passage (among others), viz:

> "'[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on.'"

The same language is quoted with approval in Justice White's *Moore* dissent. *Id.*, 97 S.Ct. at 1957-58. An earlier portion of the *Casey* opinion speaks of rejecting the notion that Fourteenth Amendment "liberty encompasses no more than those rights already guaranteed *to the individual* against federal interference by the express provisions of *the first eight Amendments*." *Id.* at 2804-05 (emphasis added).

38

1456 (1968).[27]

It appears clear that "the people," as used in the Constitution, including the Second Amendment, refers to individual Americans.

### b. "Bear Arms"

Proponents of the states' rights and sophisticated collective rights models argue that the phrase "bear arms" only applies to a member of the militia carrying weapons during actual militia service. Champions of the individual rights model opine that "bear arms" refers to any carrying of weapons, whether by a soldier or a civilian. There is no question that the phrase "bear arms" may be used to refer to the carrying of arms by a soldier or militiaman. The issue is whether "bear arms" was also commonly used to refer to

---

[27]Justice Black's concurring opinion in *Duncan* quotes with approval a portion of the remarks of Senator Howard on introducing the Fourteenth Amendment for passage in the Senate, stating that its privileges and immunities clause should include:

> "'. . . the *personal rights* guarantied and secured by the *first eight* amendments of the Constitution; *such as* the freedom of speech and of the press; the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right appertaining to each and all the people; the *right to keep and to bear arms*; the right to be exempted from the quartering of soldiers in a house without the consent of the owner; the right to be exempt from unreasonable searches and seizures, and from any search or seizure except by virtue of a warrant issued upon a formal oath or affidavit; the right of an accused person to be informed of the nature of the accusation against him, and his right to be tried by an impartial jury of the vicinage; and also the right to be secure against excessive bail and against cruel and unusual punishments.'" *Id*. at 1456 (emphasis added).

the carrying of arms by a civilian.

The best evidence that "bear arms" was primarily used to refer to military situations comes from *Aymette v. State*, 2 Humph., Tenn. 154 (1840), a prosecution for carrying a concealed bowie knife. The Supreme Court of Tennessee, in construing section 26 of its declaration of rights, providing that "the free white men of this State have a right to keep and bear arms for their common defence," stated:

> "The 28th section of our bill of rights provides 'that no citizen of this State shall be compelled to bear arms provided he will pay an equivalent, to be ascertained by law.' Here we know that the phrase has a military sense, and no other; and we must infer that it is used in the same way in the 26th section, which secures to the citizen the right to bear arms. A man in pursuit of deer, elk, and buffaloes might carry his rifle every day for forty years, and yet it would never be said of him that he had borne arms . . . ."

Unlike the Tennessee constitution at issue in *Aymette*, the Second Amendment has no "for their common defence" language and the United States Constitution contains no provision comparable to section 28 of the Tennessee constitution on which the *Aymette* court relied.

Amici supporting the government also cite other examples of state constitutional provisions allowing a conscientious objector to be excused from the duty of bearing arms if he pays an equivalent so that another can serve in his place.[28]

---

[28]New Hampshire's 1784 Constitution contained such a provision and Rhode Island's 1790 ratification convention proposed an amendment to the United States Constitution that would have included a conscientious objector clause.

However, there are numerous instances of the phrase "bear arms" being used to describe a civilian's carrying of arms. Early constitutional provisions or declarations of rights in at least some ten different states speak of the right of the "people" [or "citizen" or "citizens"] "to bear arms in defense of themselves [or "himself"] and the state," or equivalent words, thus indisputably reflecting that under common usage "bear arms" was in no sense restricted to bearing arms in military service.[29]    And such

_____

[29]*See* ALA. CONST. Art. 1, § 23 (1819) ("Every citizen has a right to bear arms in defense of himself and the state."); CONN. CONST. Art. I, § 17 (1818) ("Every citizen has a right to bear arms in defense of himself and the State."); IND. CONST. Art. I, § 20 (1816) ("That the people have a right to bear arms for the defence of themselves and the State; and that the military shall be kept in strict subordination to the civil power."); Ky. Const. Art. 10, ¶ 23 (1792) ("That the right of the citizens to bear arms in defense of themselves and the State, shall not be questioned"); MICH. CONST. Art. I, § 13 (1835) ("Every person has a right to keep and bear arms for the defense of himself and the State."); MISS. CONST. ART. I, § 23 (1817) ("Every citizen has a right to bear arms, in defence of himself and the State."); MO. CONST. Art. XIII, § 3 (1820) ("That the people have the right peaceably to assemble for their common good, and to apply to those vested with the powers of government for redress of grievances by petition or remonstrance; and that their right to bear arms in defense of themselves and of the State cannot be questioned."); OHIO CONST. Art. VIII, § 20 (1802) ("That the people have a right to bear arms for the defense of themselves and the State; and as standing armies, in time of peace, are dangerous to liberty, they shall not be kept up, and that the military shall be kept under strict subordination to the civil power."); PA. CONST., Declaration of the Rights of the Inhabitants of the Commonwealth or State of Pennsylvania, Art. XIII (September 28, 1776) ("That the people have a right to bear arms for the defence of themselves and the state;"); PA. CONST. Art. I, § 21 (1790) ("The right of the citizens to bear arms in defense of themselves and the State shall not be questioned."); VT. Declaration of the Rights of the Inhabitants of the State of Vermont Chp. 1 art. XV (July 8, 1777) ("That the people have a right to bear arms for the defence of themselves and the State") (note, Vermont was claimed by New York, and was not recognized as a state until 1791).

provisions were enforced on the basis that the right to bear arms was *not* restricted to bearing arms during actual military service. *See Bliss v. Commonwealth*, 13 Am. Dec. 251, 12 Ky. 90 (Ky. 1822).

We also note that a minority of the delegates to the Pennsylvania ratification convention proposed the following amendment to the Constitution:

> "That the people have a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers."

2 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 623-24 (Merill Jensen ed., 1976). This is yet another example of "bear arms" being used to refer to the carrying of arms by civilians for non-military purposes. Also revealing is a bill drafted by Thomas Jefferson and proposed to the Virginia legislature by James Madison (the author of the Second Amendment) on October 31, 1785, that would impose penalties upon those who violated hunting laws if they "shall bear a gun out of his [the violator's] inclosed ground, unless whilst performing military duty." 2 THE PAPERS OF THOMAS JEFFERSON 443-44 (J.P. Boyd, ed. 1950). A similar indication that "bear arms" was a general description of the carrying of arms by anyone is found in the 1828 edition of Webster's American Dictionary of the English Language; where the third definition of

42

*bear* reads: "[t]o wear; to bear as a mark of authority or distinction, as, to bear a sword, a badge, a name; to bear arms in a coat."

We conclude that the phrase "bear arms" refers generally to the carrying or wearing of arms. It is certainly proper to use the phrase in reference to the carrying or wearing of arms by a soldier or militiaman; thus, the context in which "bear arms" appears may indicate that it refers to a military situation, e.g. the conscientious objector clauses cited by amici supporting the government. However, amici's argument that "bear arms" was exclusively, or even usually, used to *only* refer to the carrying or wearing of arms by a soldier or militiaman must be rejected.[30] The

[30]We also observe that to interpret state constitutional provisions protecting the right of the citizen or the people to "bear arms" as applying only where the individual is actively engaged in actual military service is necessarily to *either* (1) contemplate actual military service for that purpose as including military service other than that which is ordered or directed by the government; *or* (2) construe the constitutional provision as saying no more than that the citizen has a right to do that which the state orders him to do and thus neither grants the citizen any right nor in any way restricts the power of the state. Of course, the latter difficulty is especially applicable to the theory that such state constitutional provisions grant rights only to the state. While two (and only two) state courts (both in the twentieth century) have seemingly adopted that view, those two decisions do not appear to even recognize, much less attempt to justify, the anomaly of construing a constitutional declaration of rights as conferring rights only on the state which had them anyway. *See City of Salina v. Blaksley*, 72 Kan. 230, 83 P. 619 (Kan. 1905) (in prosecution for carrying a pistol within city limits while intoxicated, construing bill of rights provision "that the people have the right to bear arms for their defense and security" as one which "refers to the people as a collective body" and which "deals exclusively with the military. Individual rights are not considered in this section."); *Commonwealth v. Davis*, 343 N.E.2d 847 (Mass. 1976) (in prosecution for possession of

43

appearance of "bear Arms" in the Second Amendment accords fully with the plain meaning of the subject of the substantive guarantee, "the people," and offers no support for the proposition that the Second Amendment applies only during periods of actual military service or only to those who are members of a select militia. Finally, our view of "bear arms" as used in the Second Amendment appears to be the same as that expressed in the dissenting opinion of Justice Ginsburg (joined by the Chief Justice and Justices Scalia and Souter) in *Muscarello v. United States*, 118 S.Ct. 1911, 1921 (1998); viz:

> "Surely a most familiar meaning [of carrying a firearm] is, as the Constitution's Second Amendment ("keep and *bear* Arms") (emphasis added) and Black's Law Dictionary, at 214, indicate: "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."

      c.    "Keep . . . Arms"

Neither the government nor amici argue that "keep . . . Arms" commands a military connotation.[31]  The plain meaning of the right

---

shotgun with barrel less than 18 inches long, provision of § 17 of bill of rights that "the people have a right to keep and bear arms for the common defense" is "not directed to guaranteeing individual ownership or possession of weapons;" while a "law forbidding the keeping by individuals of arms that were used in the militia service might then have interfered with the effectiveness of the militia and thus offended the art. 17 right . . . that situation no longer exists; our militia, of which the backbone is the National Guard, is now equipped and supported by public funds.").

[31]We note that in *Aymette*, *supra*, the Tennessee Supreme Court, in analyzing § 26 of its bill of rights ("that the free white men of this State have a right to keep and bear arms for their common defence"),

of the people to keep arms is that it is an individual, rather than a collective, right and is not limited to keeping arms while engaged in active military service or as a member of a select militia such as the National Guard.

### d. Substantive Guarantee as a Whole

Taken as a whole, the text of the Second Amendment's substantive guarantee is not suggestive of a collective rights or sophisticated collective rights interpretation, and the

---

construed differently the "keep" and the "bear" portions of that section. As to the "bear" aspect, the court looked to § 28 of the bill of rights ("no citizen of this State shall be required to bear arms provided he will pay an equivalent") and opined that "bear" arms "has a military sense." It likewise said that in § 26 "the arms the right to keep which is secured are such as are usually employed in civilized warfare" not "those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." *Aymette* thereafter observed that as to "arms" of the type covered by § 26:

> "The citizens have *the unqualified right to keep* the weapon, it being of the character before described as being intended by this provision. *But the right to bear arms is not of that unqualified character*. The citizens may bear them for the common defence; but it does not follow that they may be borne by an individual, merely to terrify the people or for purposes of private assassination. And, . . . the Legislature may prohibit such manner of wearing as would never be resorted to by persons engaged in the common defence." (emphasis added)

This is consistent with the Court's earlier observation respecting § 26 that "although this right must be inviolably preserved, yet it does not follow that the Legislature is prohibited altogether from passing laws regulating the manner in which these arms may be *employed*." (emphasis added). A "military" connotation is given to "bear" and to some extent to "arms" but *not* to "keep." Beyond such connection as may arise from the general type of weapon, no character of military status or activity whatever was required to come within the protected right to "keep . . . arms;" that right was "unqualified;" though "the right to bear arms is not of that unqualified character."

45

implausibility of either such interpretation is enhanced by consideration of the guarantee's placement within the Bill of Rights and the wording of the other articles thereof and of the original Constitution as a whole.

2.    Effect of Preamble

We turn now to the Second Amendment's preamble: "A well-regulated Militia, being necessary to the security of a free State."  And, we ask ourselves whether this preamble suffices to mandate what would be an otherwise implausible collective rights or sophisticated collective rights interpretation of the amendment. We conclude that it does not.

Certainly, the preamble implies that the substantive guarantee is one which tends to enable, promote or further the existence, continuation or effectiveness of that "well-regulated Militia" which is "necessary to the security of a free State."  As the Court said in *Miller*, immediately after quoting the militia clauses of Article I, § 8 (cl. 15 and 16), "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of such forces the declaration and guarantee of the Second Amendment were made."  *Id*., 59 S.Ct. at 818.  We conclude that the Second Amendment's substantive guarantee, read as guaranteeing individual rights, may as so read reasonably be understood as being a guarantee which tends to enable, promote or further the existence, continuation or effectiveness of that "well-regulated Militia"

46

which is "necessary to the security of a free State."  Accordingly, the preamble does not support an interpretation of the amendment's substantive guarantee in accordance with the collective rights or sophisticated collective rights model, as such an interpretation is contrary to the plain meaning of the text of the guarantee, its placement within the Bill of Rights and the wording of the other articles thereof and of the original Constitution as a whole.[32]

---

[32]It seems clear under longstanding and generally accepted principles of statutory construction, that, at least where the preamble and the operative portion of the statute may reasonably be read consistently with each other, the preamble may not properly support a reading of the operative portion which would plainly be at odds with what otherwise would be its clear meaning. *See, e.g.,* Dwarris, A GENERAL TREATISE ON STATUTES, 268, 269 (Wm. Gould & Sons, 1871) (footnotes omitted) ("The general purview of a statute is not, however, necessarily to be restrained by any words introductory to the enacting clauses. Larger and stronger words in the enactment part of a statute may extend it beyond the preamble.  If the enacting words are plain, and sufficiently comprehensive to embrace the mischief intended to be prevented, they shall extend to it, though the preamble does not warrant the construction. . . . But though the preamble cannot control the enacting part of a statute, which is expressed in clear and unambiguous terms, yet, if any doubt arise on the words of the enacting part, the preamble may be resorted to, to explain it.  In truth, it then resolves itself into a question of intention; or in other words, recourse is had to the primary rules of interpretation.  For the words being doubtful, the preamble is compared to the rest of the act, in order to collect the intention of the legislature, whether they meant it to extend to a case like that under consideration."); Sedgwick, THE INTERPRETATION AND CONSTRUCTION OF STATUTES AND CONSTITUTIONAL LAW, 43 (Fred Rothman & Co. 1980) (reprint of 1874 edition with notes) ("In the modern English cases it is said that the preamble may be used to ascertain and fix the subject matter to which the enacting part is to be applied.  So, the purview or body of the act may even be restrained by the preamble, when no inconsistency or contradiction results.  But it is well settled that where the intention of the Legislature is clearly expressed in the purview, the preamble shall not restrain it, although it be of much narrower import."); Joel P. Bishop, COMMENTARIES ON THE WRITTEN LAWS AND THEIR INTERPRETATION, 49 (Little, Brown, 1882) (footnotes omitted) ("As showing the inducements to the act, it may have a decisive weight in a

As observed in *Miller*, "the Militia comprised all males physically capable of acting in concert for the common defense" and "that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves." *Id.*, 59 S.Ct. at 818. *Miller* further notes that "'[i]n all the colonies . . . the militia systems . . . implied the general obligation of all adult male inhabitants to possess arms.'" *Id.* (citation omitted).[33] There are

---

doubtful case. But where the body of the statute is distinct, it will prevail over a more restricted preamble. . . . We look to this introductory matter for the general intent of the legislature,–the reasons and principles upon which the law proceeds. So that, to the extent to which these can influence the interpretation, the preamble becomes important. . . . In the words of Ellenborough, C.J.: 'In a vast number of acts of Parliament, although a particular mischief is recited in the preamble, yet the legislative provisions extend far beyond the mischief recited. And whether the words shall be restrained or not must depend on a fair exposition of the particular statute in each particular case, and not upon any universal rule of construction.'").

We also observe the various particular provisions of the bill of rights of many early state constitutions contained introductory justification clauses, usually in the form of a general statement of political or governmental philosophy. Examples are given in Volokh, COMMONPLACE SECOND AMENDMENT, *supra* note 12, 794-95, 814-21. One such example is the provision of the New Hampshire Constitution of 1784 (pt. 1, art. XVII) stating: "[i]n criminal prosecutions, the trial of facts in the vicinity where they happen is so essential to the security of the life, liberty and estate of the citizen, that no crime or offence ought to be tried in any other county than that in which it is committed. . . ." It would be absurd to construe this provision to apply only when a judge agrees with the defendant that trial of the case in another county would likely jeopardize that particular defendant's life, liberty or estate.

[33]*See also* SENATE SUBCOMM. ON THE CONSTITUTION OF THE COMMITTEE ON THE JUDICIARY, 97 CONG., 2ND SESS., THE RIGHT TO KEEP AND BEAR ARMS (Comm. Print 1982): "In 1623, Virginia forbade its colonists to travel unless they were 'well armed' . . . In 1658 it required every householder to have a functioning firearm within his house." *Id.* at 9 (footnote omitted).

The Militia Act of 1792, enacted May 8, 1792, defined the militia as "each and every free able-bodied white male citizen . . . who is or

frequent contemporaneous references to "a well-regulated militia" being "composed of the body of the people, trained in arms."[34] Plainly, then, "a well-regulated Militia" refers *not* to a special or select subset or group taken out of the militia as a whole but rather to the condition of the militia as a whole, namely being

---

shall be of age eighteen years, and under the age of forty-five years . . . ." and required each to "provide himself with a good musket . . . or with a good rifle. . ."  1 Stat. 271 (1792).

The modern militia statute, 10 U.S.C. § 311 provides:

"(a) The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.

(b) The classes of the militia are–

(1) the organized militia, which consists of the National Guard and the Naval Militia; and

(2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia."

[34]"That the People have a Right to keep & to bear Arms; that a well regulated Militia, composed of the Body of the People, trained to Arms, is the proper natural and safe Defence of a free State . . . ." *Richmond Antifederal Committee Proposed Bill of Rights*, § 17, *reprinted in* Young, THE ORIGIN OF THE SECOND AMENDMENT (2nd ed. 1995) (Golden Oak Books) (hereafter *Young*), at 390.

Virginia's proposed Bill of Rights included a similar provision: "That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural, and safe defence of a free state . . . ."  3 Jonathan Elliot, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 659 (2d ed., 1836).  North Carolina proposed a virtually identical provision, 4 Jonathan Elliot, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 244 (2d ed., 1836), as also did New York, *New York Convention*, July 26, 1788, *reprinted in* Young, *supra*, at 480-88.

well disciplined and trained.[35]  And, "Militia," just like "well-regulated Militia," likewise was understood to be composed of the people generally possessed of arms which they knew how to use, rather than to refer to some formal military group separate and distinct from the people at large.[36]  Madison also plainly shared these views, as is reflected in his Federalist No. 46 where he argued that power of Congress under the proposed constitution "[t]o raise and support Armies" (art. 1, § 8, cl.12) posed no threat to liberty because any such army, if misused, "would be opposed [by] a militia amounting to near half a million of citizens with arms in their hands" and then noting "the advantage of being armed, which the Americans possess over the people of almost every other nation," in contrast to "the several kingdoms of Europe" where "the

---

[35]"It has been urged that they [standing armies] are necessary to provide against sudden attacks.  Would not a well regulated militia, duly trained to discipline, afford ample security?"  The Impartial Examiner, VIRGINIA INDEPENDENT CHRONICLE, February 27, 1788, excerpt reprinted in Young, *supra*, at 285.
  "A well regulated and disciplined militia, is at all times a good objection to the introduction of that bane of all free governments–a standing army."  Governor John Hancock, NEW YORK JOURNAL, January 28, 1790, *reprinted in* Young, *supra*, at 731.

[36]*See, e.g.,* DEBATES IN THE CONVENTION OF THE COMMONWEALTH OF VIRGINIA, *reprinted in* 3 J. ELLIOT, DEBATES IN THE SEVERAL STATE CONVENTIONS 425 (3d ed. 1937) (statement of George Mason, June 14, 1788) ("Who are the militia? They consist now of the whole people....");  LETTERS FROM THE FEDERAL FARMER TO THE REPUBLICAN 123 (W. Bennett ed. 1978) (ascribed to Richard Henry Lee) ("[a] militia, when properly formed, are in fact the people themselves....");  Letter from Tench Coxe to the Pennsylvania Gazette (Feb. 20, 1778), *reprinted in* THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION (Mfm. Supp. 1976) ("Who are these militia? *are they not ourselves.*") (emphasis in original).

50

governments are afraid to trust the people with arms." The Federalist Papers at 299 (Rossiter, New American Library). Plainly, Madison saw an armed people as a foundation of the militia which would provide security for a "free" state, one which, like America but unlike the "kingdoms of Europe," was not afraid to trust its people to have their own arms.[37] The militia consisted of the people bearing their own arms when called to active service, arms which they kept and hence knew how to use. If the people were disarmed there could be no militia (well-regulated or otherwise) as it was then understood. That expresses the proper understanding of the relationship between the Second Amendment's preamble and its substantive guarantee. As stated in Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, *supra* note 12, "the [second] amendment's wording, so opaque to us, made perfect sense to the Framers: believing that a militia (composed of the entire people possessed of their individually owned arms) was necessary for the protection of a free state, they guaranteed the people's right to possess those arms." *Id*. at 217-18. Similarly, Cooley,

---

[37]Hamilton in Federalist 29 likewise obviously considered the militia as being composed of "the people at large," though he did not believe such a force could be made very effective. He states that "disciplining all of the militia" would be "futile," requiring more than "a month" (obviously per year), and that "[l]ittle more can reasonably be aimed at with respect to the people at large than to have them properly armed and equipped; and in order to see that this be not neglected, it will be necessary to assemble them once or twice in the course of a year." Hamilton therefore took the position that "the proper establishment of the militia" also required "the formation of a select corps of moderate size." The Federalist Papers, *supra* at 184-85.

GENERAL PRINCIPLES OF CONSTITUTIONAL LAW (Little, Brown, 1880; 1981 Rothman & Co. reprint) rejects, as "not warranted by the intent," an interpretation of the Second Amendment "that the right to keep and bear arms was only guaranteed to the Militia," and states "[t]he meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose. But this enables the government to have a well-regulated militia; for to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." *Id*. at 271. Much the same thought was expressed more than one hundred years later in the following passage from Tribe, AMERICAN CONSTITUTIONAL LAW (3d ed. 2000):

> "Perhaps the most accurate conclusion one can reach with any confidence is that the core meaning of the Second Amendment is a populist/republican/federalism one: Its central object is to arm "We the People" so that ordinary citizens can participate in the collective defense of their community and their state. But it does so not through directly protecting a right on the part of states or other collectivities, assertable by them against the federal government, to arm the populace as they see fit. Rather, the amendment achieves its central purpose by assuring that the federal government may not disarm individual citizens without some unusually strong justification consistent with the authority of the states to organize their own militias. That assurance in turn is provided through recognizing a right (admittedly of uncertain scope) on the part of individuals to possess and use firearms in the defense of themselves and their homes . . . a right that directly limits action by Congress or by the Executive Branch . . ." *Id*., Vol. 1, n.221 at 902.

In sum, to give the Second Amendment's preamble its full and proper due there is no need to torture the meaning of its substantive guarantee into the collective rights or sophisticated collective rights model which is so plainly inconsistent with the substantive guarantee's text, its placement within the bill of rights and the wording of the other articles thereof and of the original Constitution as a whole.

D.    History

1.    Introduction

Turning to the history of the Second Amendment's adoption, we find nothing inconsistent with the conclusion that as ultimately proposed by Congress and ratified by the states it was understood and intended in accordance with the individual rights model as set out above.

On May 25, 1787, the Federal Convention began meeting in Philadelphia to craft what would become the United States Constitution. The primary shortcoming of the Articles of Confederation was that the central government it provided for was too weak. It was generally recognized that, although a stronger central government was needed, the central government was to remain one of limited and enumerated powers only, lest the cure be worse than the disease. Thus, the challenge was to design a federal government strong enough to deal effectively with that particular range of issues requiring federal control, without enabling the

53

federal government to become an instrument of tyranny. Not surprisingly, political leaders of that day differed as to the proper balance of these concerns. The Federalists favored a strong federal government. The Anti-Federalists were much more suspicious and fearful of a strong federal government and wanted numerous safeguards in place to protect the people and the states from being tyrannized and oppressed by the federal government. The Federal Convention was dominated by the Federalists. On September 17, 1787, the Convention completed its work and forwarded the Constitution to the Confederation Congress.

### 2. The Anti-Federalists' Fears

The Constitution alarmed Anti-Federalists for three reasons relevant to the debate over the meaning of the Second Amendment.

First, although the proposed federal government appeared to be one of limited and enumerated powers, the Anti-Federalists feared that it would someday attempt to infringe one or more of the people's fundamental rights. To help prevent this, the Anti-Federalists wanted the United States Constitution, like most of the state Constitutions, to contain a Bill of Rights.[38]

Second, the Constitution gave the federal government large powers over the militia, allowing the Congress:

> "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;
> To provide for organizing, arming, and disciplining, the

---

[38]See Appendix-part 1.

54

> Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;".

U.S. CONST. art. I, § 8, cl. 15, 16. Congress was also given the power "To raise and support Armies." *Id.* art. I, § 8, cl. 12. The states were also forbidden to keep troops without the consent of Congress. *Id.* art. I, § 10, cl. 3.

The Anti-Federalists feared that the federal government would act or fail to act so as to destroy the militia, e.g. failure to arm the militia,[39] disarmament of the militia[40], failure to prescribe

---

[39]*See* Patrick Henry, Virginia Convention, June 5, 1788 (*excerpt reprinted in* Young, *supra* note 34 at 373) ("Your militia is given up to Congress . . . of what service would militia be to you, when, most probably, you will not have a single musket in the state? [F]or, as arms are to be provided by Congress, they may or may not furnish them."); Patrick Henry, Virginia Convention, June 9, 1788 (*excerpt reprinted in* Young, *supra* at 381) ("We have not one fourth of the arms that would be sufficient to defend ourselves. The power of arming the militia, and the means of purchasing arms, are taken from the states by the paramount powers of Congress. If Congress will not arm them, they will not be armed at all."); George Mason, Virginia Convention, June 14, 1788 (*excerpt reprinted in* Young, *supra* at 401) ("Under various pretences, Congress may neglect to provide for arming and disciplining the militia; and the state governments cannot do it, for Congress has an exclusive right to arm them . . . . Should the national government wish to render the militia useless, they may neglect them, and let them perish, in order to have a pretence of establishing a standing army.").

[40]Aristocrotis, THE GOVERNMENT OF NATURE DELINEATED OR AN EXACT PICTURE OF THE NEW FEDERAL CONSTITUTION [Anti-Federalist satire of the Federalist position], April 15, 1788 (*excerpts reprinted in* Young, *supra* note 34, at 329-335) ("The second class or inactive militia, comprehends all the rest of the peasants; viz. the farmers, mechanics, labourers, etc. which good policy will prompt government to disarm. It would be dangerous to trust such a rable as this with arms in their hands."); Letter from George Mason to Thomas Jefferson (May 26, 1788) (*excerpt reprinted in* Young, *supra* at 365-66) ("There are many other things very objectionable

55

training for the militia[41], creation of a select militia[42] or making

militia service so unpleasant that the people would demand a

in the proposed new Constitution; particularly the almost unlimited Authority over the Militia of the several States; whereby, under Colour of regulating, them may disarm, or render useless the Militia, the more easily to govern by a standing Army; or they may harass the Militia, by such rigid Regulations, and intollerable Burdens, as to make the People themselves desire it's Abolition."); George Mason, Virginia Convention, June 14, 1788 (*excerpt reprinted in* Young, *supra* at 401) ("There are various ways of destroying the militia. A standing army may be perpetually established in their stead. I abominate and detest the idea of a government, where there is a standing army. The militia may be here destroyed by that method which has been practised in other parts of the world before; that is, by rendering them useless-by disarming them."); William Lenoir, North Carolina Convention, July 30, 1788 (*excerpt reprinted in* Young, *supra* at 496-500) ("When we consider the great powers of Congress, there is great cause of alarm. They can disarm the militia. If they were armed, they would be a resource against great oppressions.").

[41]Patrick Henry, Virginia Convention, June 5, 1788 (*excerpt reprinted in* Young, *supra* note 34, at 374) ("If they [Congress] neglect or refuse to discipline or arm our militia, they will be useless: the states can do neither-this power being exclusively given to Congress.").

[42]*See* A NUMBER OF LETTERS FROM THE FEDERAL FARMER TO THE REPUBLICAN, Letter III, November 8, 1787 (*reprinted in* Young, *supra* note 34, at 91) ("it is true, the yoemanry of the country possess the lands, the weight of property, possess arms, and are too strong a body of men to be openly offended-and, therefore, it is urged [by the Federalists], they will take care of themselves, that men who shall govern will not dare pay any disrespect to their opinions. It is easily perceived, that if they have not their proper negative upon passing laws in congress, or on the passage of laws relative to taxes and armies, they may in twenty or thirty years be by means imperceptible to them, totally deprived of that boasted weight and strength: This may be done in a great measure by congress, if disposed to do it, by modelling the militia. Should one fifth, or one eighth part of the men capable of bearing arms, be made a select militia, as has been proposed, and those the young and ardent part of the community, possessed of but little or no property, and all the others put upon a plan that will render them of no importance, the former will answer all the purposes of an army, while the latter will be defenceless."). *See also* note 58, *infra*.

standing army or select militia.[43]  These concerns over the militia

were exacerbated by the third issue: the federal government's power

to maintain a standing army (art. I, § 8, cl.12).  The Anti-

Federalists feared that the federal government's standing army

could be used to tyrannize and oppress the American people.[44]

---

[43]Luther Martin, Baltimore MARYLAND JOURNAL, March 18, 1788 (*excerpt reprinted in* Young, *supra* note 34, at 301-302) ("That a system [the Constitution] may enable government wantonly to exercise power over the militia, to call out an unreasonable number from any particular state without its permission, and to march them upon, and continue them in, remote and improper services–that the same system should enable the government totally to discard, render useless, and even disarm the militia, when it would remove them out of the way of opposing its ambitious views, is by no means inconsistent, and is really the case in the proposed constitution . . . . It [the federal government] has also, by another clause, the powers, by *which only* the militia can be organized and armed, and by the neglect of which they may be rendered utterly useless and insignificant, when it suits the ambitious purposes of government:–Nor is the suggestion unreasonable . . . that the government might improperly oppress and harass the militia, the better to reconcile them to the idea of regular troops, who might relieve them of the burthen, and to render them less opposed to the measures it might be disposed to adopt for the purpose of reducing them to that state of insignificancy and uselessness."); George Mason, Virginia Convention, June 14, 1788 (*excerpt reprinted in* Young, *supra* at 401,402) ("If they [Congress] ever attempt to harass and abuse the militia, they may abolish them, and raise a standing army in their stead. . . . If, at any time, our rulers should have unjust and iniquitous designs against our liberties, and should wish to establish a standing army, the first attempt would be to render the service and use of militia odious to the people themselves–subjecting them to unnecessary severity of discipline in time of peace, confining them under martial law, and disgusting them so much as to make them cry out. 'Give us a standing army!'").

[44]*See* A Democratic Federalist, PHILADELPHIA PENNSYLVANIA HERALD, October 17, 1787 (*excerpts reprinted in* Young, *supra* note 34, at 46) ("[T]he federal rulers are vested with each of the three essential powers of government–their laws are to be *paramount* to the laws of the different states.  What then will there be to oppose their encroachments? Should they ever pretend to tyrannize over the people, their *standing army* will silence every popular effort; it will be theirs to explain the powers which have been granted to them. . . . [T]he

Without a militia to defend against the federal government's

standing army, the states and their citizens would be defenseless.[45]

---

liberty of the people will be no more. . . .”); Centinel II, PHILADELPHIA INDEPENDENT GAZETTEER, October 24, 1787 (*excerpts reprinted in* Young, *supra* at 59) (“A standing army with regular provision of pay and contingencies, would afford a strong temptation to some ambitious man to step up into the throne, and to seize absolute power.”); Philadelphienses III, Philadelphia FREEMAN'S JOURNAL, December 5, 1787 (*excerpts reprinted in* Young, *supra* at 139) (“And in respect to the *standing army*, it will only be made up of profligate idle ruffians, whose prowess will chiefly consist of feats of cruelty exercised on their innocent fellow citizens . . . .”); A Farmer, Exeter, New Hampshire FREEMAN'S ORACLE, January 11, 1788 (*excerpts reprinted in* Young, *supra* at 206) (“An army, either in peace or war, is like the locust and caterpillers of Egypt; they bear down all before them–and many times, by designing men, have been used as an engine to destroy the liberties of a people, and reduce them to the most abject slavery. . . . Organize your militia, arm them well, and under Providence they will be a sufficient security.”); A Ploughman, Winchester VIRGINIA GAZETTE, March 19, 1788 (*reprinted in* Young, *supra* at 303) (“And in order to rivet the chains of perpetual slavery upon us, they have made a standing army an essential part of the Federal Constitution, which the world cannot produce an instance of a more permanent foundation to erect the fabrik of tyranny upon; . . . to keep a standing army, gives cause to suspect that the rulers are afraid of the people, or that they may have a design upon them. If their designs are oppressive, the army is necessary to compleat the tyranny; if the army is the strongest force in a State, it must be a military government, and it is eternally true, that a free government and a standing army are absolutely incompatible.”).

[45]*See* Philadelphia FREEMAN'S JOURNAL, January 16, 1788 (*excerpt reprinted in* Young, *supra* note 34, at 211-13) (“They well know the impolicy of putting or keeping arms in the hands of a nervous people, at a distance from the seat of a government, upon whom they mean to exercise the powers granted in that government. . . . Tyrants have never placed any confidence on a militia composed of freemen. Experience has taught them that a standing body of regular forces, whenever they can be completely introduced, are always efficacious in enforcing their edicts, however arbitrary . . . . There is no instance of any government being reduced to a confirmed tyranny without military oppression; and the first policy of tyrants has been to annihilate all other means of national activity and defence, when they feared opposition, and to rely solely upon standing troops.”); Luther Martin, *Genuine Information IV*, Baltimore MARYLAND GAZETTE, January 17, 1788 (*excerpt reprinted in* Young, *supra* at 221) (“[W]hen a government *wishes*

Thus, the Anti-Federalists wanted the Constitution amended in three ways *prior* to ratification: 1) addition of a Bill of Rights; 2) recognition of the power of the states to arm and train their militias;[46] and 3) curtailment of the federal government's power to maintain a standing army.

### 3. The Federalist Response

The Federalists, of course, wanted the Constitution to be ratified. Because the Constitution could only be ratified unchanged, this forced the Federalists to oppose all attempts to alter it prior to ratification. The Federalists argued that no bill of rights was needed for three reasons: 1) it was beyond the purview of the federal government, intended to be one of limited

---

to deprive their citizens of freedom, and reduce them to slavery, it *generally makes use of a standing army* for that purpose, and *leaves the militia in a situation as contemptible as possible, least they might oppose its arbitrary designs*–That in *this* system [the Constitution], we give the general government every provision it could wish for, and even *invite* it to *subvert* the *liberties* of the *States* and *their citizens*, since we give them the right to encrease and keep up a standing army as numerous as *it* would wish, and by placing the militia under *its* power, enable it to leave the militia *totally unorganized, undisciplined and even to disarm them*; while the *citizens*, so far from complaining of this *neglect*, might even esteem it a favour in the general government, as thereby they would be freed from the burthen of military duties, and left to their own private occupations or pleasures."); Patrick Henry, Virginia Convention, June 5, 1788 (*excerpts reprinted in* Young, *supra* at 370) ("Have we the means of resisting disciplined armies, when our only defence, the militia, is put into the hands of Congress?").

[46]George Mason, Virginia Convention, June 14, 1788 (*excerpt reprinted in* Young, *supra* note 34, at 402) ("I wish that, in case the general government should neglect to arm and discipline the militia, there should be an express declaration that the state governments might arm and discipline them.").

and enumerated powers, to infringe upon fundamental rights;[47] 2) any enumeration of fundamental rights might imply that the federal government had power to infringe upon those not mentioned;[48] and 3) the American people were used to being free-they would not allow their rights to be infringed.[49]

Realizing that the Anti-Federalists' two other concerns (federal control of arming and training of the militia and maintenance of a standing army) boiled down to a fear that the federal government's standing army would oppress a defenseless people, the Federalists' responded that: 1) the American people are armed and hence could successfully resist an oppressive standing army;[50] and 2) federal militia powers obviated the need for, or minimized the likelihood of, a large standing army being kept in existence.[51]

The Federalists also responded to the militia issue by arguing that the states had concurrent power to arm the militia, but this position was undermined when the Anti-Federalists invited the Federalists to put that state power in writing and that would have necessitated the return to the drawing board in another

---

[47]See Appendix-part 2.

[48]See Appendix-part 3.

[49]See Appendix-part 4.

[50]See Appendix-part 5.

[51]See Appendix-part 6.

Constitutional convention that the Federalists were committed to

avoiding.[52]

The Federalist position as to the militia and standing army

issues depended upon the people being armed notwithstanding that

the Constitution did not guarantee the right of the people to be

armed.[53]

### 4.   State Ratifications

Congress forwarded the Constitution to the states on September

---

[52]James Madison, Virginia Convention, June 14, 1788  (*excerpt reprinted in* Young, *supra* note 34, at 403) ("I cannot conceive that this Constitution, by giving the general government the power of arming the militia, takes it away from the state governments.  The power is concurrent, and not exclusive."); Patrick Henry, Virginia Convention, June 14, 1788 (*excerpt reprinted in* Young, *supra* at 407) ("The great object is, that every man be armed. . . .  When this power is given up to Congress without limitation or bounds, how will your militia be armed?  You trust to chance; for sure I am that that nation which shall trust its liberties in other hands cannot long exist.  If gentlemen are serious when they suppose a concurrent power, where can be the impolicy to amend it?").

[53]Some of the Federalists' responses, e.g., James Madison's in Federalist 46, spoke of the militia as defending the people against federal tyranny.  Opponents of the individual rights view assert that these references to the militia indicate that the Federalists' response depended not on the people being armed, but on the states having the power to arm the militia.  While it is true that the Anti-Federalists desired this concession, the Second Amendment did *not* provide it.  We think Madison's message in Federalist 46 is clear: the Anti-Federalists were not to worry about federal tyranny because those who comprised the militia could resist such tyranny *since the the American people were armed*.  Federalist 46 speaks about the significance of the government trusting the *people* with arms and of the states as a "barrier against the enterprises of ambition", but does *not* say that the state governments had (or would be given) power to arm the militia. Federalist 46 clearly depends, in large part, on the American people being armed.  In this respect, Madison's rationale in Federalist 46 is substantially the same as that of the Second Amendment which he would craft over a year later.

28, 1787. State conventions began considering the Constitution later that year. By April 28, 1788, Delaware, New Jersey, Georgia, Connecticut and Maryland had ratified the Constitution without proposing any additions or changes to it. The first sign of trouble in a state convention was in Pennsylvania in December of 1787.

### a. Pennsylvania

In the Pennsylvania convention, the Federalists outnumbered the Anti-Federalists about two to one. Not surprisingly, then, on December 12, 1787, the Pennsylvania convention ratified the Constitution by a vote of 46 to 23. The convention did not propose any changes to the Constitution. However, the disenchanted Anti-Federalists, known as the Pennsylvania Minority, explained that they would have agreed to the Constitution if it had been amended to reflect fourteen principles, among which were the following:

> "7. That the people have a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil power.
> ....
> 11. That the power of organizing, arming, and disciplining the militia (the manner of disciplining the militia to be prescribed by Congress) remain with the individual states, and that Congress shall not have authority to call or march any of the militia out of their own state, without the consent of such state and for such length of time only as such state shall agree."

2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 623-24 (Merrill Jensen, ed. 1976). Note that "bear arms" clearly pertains to private, civilian wearing or carrying of arms and the power of the state to organize, arm and discipline the militia is in a separate section, indicating that the Anti-Federalists viewed these issues as distinct.

### b. Massachusetts

Massachusetts ratified the Constitution on February 7, 1788, by a vote of 187 to 168. Although the convention proposed nine amendments, none of them has relevance to the issues with which we are concerned. However, during the Massachusetts convention, Samuel Adams proposed the following amendments:

> "And that the said Constitution be never construed to authorize Congress to infringe the just liberty of the press, or the rights of conscience; or to prevent the people of the United States, who are peaceable citizens, from keeping their own arms; or to raise standing armies, unless when necessary for the defense of the United States, or of some one or more of them; or to prevent the people from petitioning, in a peaceable and orderly manner, the federal legislature, for a redress of grievances; or to subject the people to unreasonable searches and seizures of their persons, papers or possessions."

DEBATES OF THE MASSACHUSETTS CONVENTION OF 1788 86-87, 266 (Boston, 1856). This is another indication that the Anti-Federalists desired protection for the right of all peaceful citizens to keep arms as well as a limitation on the power of the federal government to maintain a large standing army.

### c. South Carolina

63

The South Carolina Convention ratified the Constitution on May 23, 1788, stating two understandings and proposing two amendments, none of which are relevant to the issues before us.

### d.    New Hampshire

After adjourning on February 22, 1788, to avoid rejection of the Constitution, New Hampshire ratified the Constitution on June 21, 1788, by a vote of 57 to 47.   The New Hampshire convention proposed twelve amendments, the first nine of which are identical to Massachusetts'.   New Hampshire's proposed Amendments 10 and 12 were as follows:

> "X. That no standing army shall be kept up in time of peace, unless with the consent of three-fourths of the members of each branch of Congress; nor shall soldiers, in time of peace, be quartered upon private houses, without the consent of the owners.
> ....
> XII. Congress shall never disarm any citizen, unless such as are or have been in actual rebellion."

1 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed., 1836).   New Hampshire sought to protect the individual right of all citizens to have arms and, separately, to limit the power of the federal government to maintain a large standing army.

### e.    Virginia

On June 25, 1788, the Virginia convention ratified the Constitution by a vote of 89 to 79.  The convention proposed a bill of rights containing twenty separate provisions and, in a separate section, proposed twenty amendments to the Constitution.   The

64

seventeenth part of Virginia's proposed Bill of Rights and the

ninth and eleventh parts of its proposed amendments to the

Constitution were as follows:

> [Bill of Rights section.]
> "17th. That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural, and safe defence of a free state; that standing armies, in time of peace, are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the community will admit; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power.
>
> [Amendments to the Constitution section.]
> 9th. That no standing army, or regular troops, shall be raised, or kept up, in time of peace, without the consent of two thirds of the members present, in both houses.
>
> 11th. That each state respectively shall have the power to provide for organizing, arming, and disciplining its own militia, whensoever Congress shall omit or neglect to provide for the same.  That the militia shall not be subject to martial law, except when in actual service, in time of war, invasion, or rebellion; and when not in the actual service of the United States, shall be subject only to such fines, penalties, and punishments, as shall be directed or inflicted by the laws of its own state."

3 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption

of the Federal Constitution 658, 660 (2d ed., 1836).  The bill of rights

provision, *after* stating "[t]hat the people have a right to keep

and bear arms," goes on to make general, philosophical observations

about the militia and standing armies.  However, these general,

philosophical observations are given their legal effectuation

through separate, specific provisions apart from the Bill of

Rights.  The Virginia convention realized that statements in the

proposed Bill of Rights that militias are good and standing armies are bad fell short of adding to the power of the states or subtracting from the power of the federal government. In the separate and distinct amendments section, the states were explicitly given militia powers and the federal government was forbidden to maintain a standing army unless other specific criteria were satisfied.

### f. New York

On July 26, 1788, New York ratified the Constitution by a vote of 30 to 27. New York incorporated an extensive Declaration of Rights and thirty-three proposed amendments to the Constitution into its ratification. The relevant portions of each are:

> [Declaration of Rights section.]
> "That the people have a right to keep and bear arms; that a well-regulated militia, including the body of the people *capable of bearing arms*, is the proper, natural, and safe defence of a free state.
> ...
> That standing armies, in time of peace, are dangerous to liberty, and ought not to be kept up, except in cases of necessity; and that at all times the military should be under strict subordination to the civil power.
>
> [Amendments to the Constitution section.]
> That no standing army or regular troops shall be raised, or kept up, in time of peace, without the consent of two thirds of the senators and representatives present in each house."

1 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 328, 330 (2d ed., 1836). Note that: 1) the philosophical declaration concerning the preferability of a militia, which follows the statement "[t]hat the people have a

66

right to keep and bear arms," is *not* effectuated in the amendments section by a grant of power to the states to maintain a militia; and 2) there is a separate clause in the Declaration of Rights section regarding standing armies which *is* effectuated by a separate proposed amendment to the Constitution. This is another example that philosophical declarations alone were considered insufficient to subtract from the federal government's power or to add to the states' power.

### g. North Carolina

On August 1, 1788, North Carolina refused to ratify the Constitution until a bill of rights and other amendments were added. The North Carolina convention demanded the same Bill of Rights and amendments as proposed by Virginia. It was not until November 21, 1789, after the Bill of Rights was forwarded by the First Congress to the states, that North Carolina finally ratified the Constitution by a vote of 194-77.

### h. Rhode Island

Rhode Island did not ratify the Constitution until May 29, 1790, and then by a vote of 34-32. Rhode Island incorporated a bill of rights into its ratification and proposed twenty-one amendments to the Constitution. The apposite portions of each are:

> [Declaration of Rights section.]
> "XVII. That the people have a right to keep and bear arms; that a well-regulated militia, including the body of the people capable of bearing arms, is the proper, natural, and safe defence of a free state; that the militia shall not be subject to martial law, except in

67

time of war, rebellion, or insurrection; that standing armies, in time of peace, are dangerous to liberty, and ought not to be kept up, except in cases of necessity; and that, at all times, the military should be under strict subordination to the civil power; that, in time of peace, no soldier ought to be quartered in any house without the consent of the owner, and in time of war only by the civil magistrates, in such manner as the law directs.

[Amendments to the Constitution section.]
XII. As standing armies, in time of peace, are dangerous to liberty, and ought not to be kept up, except in cases of necessity, and as, at all times, the military should be under strict subordination to the civil power, that, therefore, no standing army or regular troops shall be raised or kept up in time of peace."

*Id*. at 335-36. Note how even the amendment regarding standing armies contains two philosophical declarations before getting to the substantive restriction on federal power, namely that no army shall be maintained during peacetime.

### 5. Proposal of Second Amendment

By mid 1788, the required nine states had ratified the Constitution, and it was clear the Federalists had won a major victory. But by the spring of 1789, the Anti-Federalists had succeeded in persuading many that a bill of rights was absolutely necessary. Some Anti-Federalists did continue to argue for additional, structural changes to the Constitution, but most were primarily concerned with a bill of rights. At the same time, while some Federalists continued to reject any changes to the Constitution, most softened their opposition to a bill of rights, mindful of the strong public support for it and aware that a bill

of rights would not materially affect the plan of government they had worked so diligently to implement. *See* President George Washington, Inaugural Address, April 30, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 642) ("I assure myself that whilst you carefully avoid every alteration which might endanger the benefits of an united and effective government, or which ought to await the future lessons of experience; a reverence for the characteristic rights of freemen, and a regard for the public harmony, will sufficiently influence your deliberations on the question how far the former can be more impregnably fortified, or the latter be safely and advantageously promoted."); Letter from Charles Smith to Tench Coxe (October 18, 1788) (*excerpt reprinted in* Young, *supra* note 34, at 542) ("It seems, therefore, to be the wish of the moderate and reasonable men of all parties that some necessary explanations should take place, in order to quiet the minds of our dissenting fellow citizens, and to introduce union and harmony throughout the state. Attention to this subject ought to be considered as a duty incumbent upon our first federal Representatives."). Thus, as there sometimes is after a hard-fought political struggle, most of the combatants, for the good of the country, sought middle ground.

Federalist James Madison ran for a seat in the First Congress, and because of the strong public support for a bill of rights clarified his own support for it:

"The offer of my services to the district, rests on the following grounds:–That although *I* always conceived the constitution might be improved, yet *I* never could see in it, as it stands, the dangers which have alarmed many respectable citizens; that I held it my duty therefore, whilst the constitution remained unratified, and it was necessary to unite the various opinions, interests and prejudices of the different states, in some one plan, to oppose every previous amendment, as opening a door for endless and dangerous contentions among the states, and giving an opportunity to the secret enemies of the union to promote its dissolution:–That the change of circumstances produced by the secure establishment of the plan proposed, leaves me free to espouse such amendments as will, in the most satisfactory manner, guard essential rights, and will render certain vexatious abuses of power impossible . . ."

James Madison, *Extract of a letter from the Hon.* JAMES MADISON*, jun. to his friend in this county*, Fredericksburg VIRGINIA HERALD, January 29, 1788 (*reprinted in* Young, *supra* note 34, at 609). The Federalists ended up with a majority in both the House and the Senate. But as the eventual adoption of a bill of rights shows, many Federalists were as open to a bill of rights as James Madison himself was. *See* Letter from James Madison to Edmund Pendleton (April 8, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 640) ("The subject of amendments has not yet been touched–From appearances there will be no great difficulty in obtaining reasonable ones. It will depend however entirely on the temper of the federalists, who predominate as much in both branches, as could be wished. Even in this State [Virginia], notwithstanding the violence of its antifederal symptoms, three of its six representatives at least will be zealous friends to the

Constitution, and it is not improbable that a fourth will be of the same description."). The Anti-Federalists sensed that although the tide had turned their way as to alterations that would secure individual liberty, the prospects for other changes to the Constitution were dim. *See* Letter from Richard Henry Lee to Patrick Henry (May 28, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 644)("I think, from what I hear and see, that many of our amendments will not succeed, but my hopes are strong that such as may effectually secure civil liberty will not be refused.").

a. Legislative History

On June 8, 1789, Virginia Congressman James Madison proposed several alterations to the Constitution in the First Congress. In his address to the House, Madison explained his rationale in proposing the changes:

> "I wish, among other reasons why something should be done, that those who have been friendly to the adoption of this constitution may have the opportunity of proving to those who were opposed to it that they were as sincerely devoted to liberty and a Republican Government, as those who charged them with wishing the adoption of this constitution in order to lay the foundation of an aristocracy or despotism. It will be a desirable thing to extinguish from the bosom of every member of the community, any apprehension that there are those among his countrymen who wish to deprive them of the liberty for which they valiantly fought and honorably bled. And if there are amendments desired of such a nature as will not injure the constitution, and they can be ingrafted so as to give satisfaction to the doubting part of our fellow-citizens, the friends of the Federal Government will evince that spirit of deference and concession for which they have hitherto been distinguished.
> ....
> I should be unwilling to see a door opened for a re-

71

consideration of the whole structure of the Government–for a re-consideration of the principles and the substance of the powers given; because I doubt, if such a door were opened, we should be very likely to stop at that point which would be safe to the Government itself.  But I do wish to see a door opened to consider, so far as to incorporate those provisions for the security of rights, against which I believe no serious objection has been made by any class of our constituents: such as would be likely to meet with the concurrence of two-thirds of both Houses, and with the approbation of three-fourths of the State Legislatures."

James Madison, House of Representatives, June 8, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 651–53).  Madison proposed to insert, in Article I, Section 9, between its Clauses 3 and 4, the following clause (among others):

"The right of the people to keep and bear arms shall not be infringed; a well armed and well regulated militia being the best security of a free country; but no person religiously scrupulous of bearing arms shall be compelled to render military service in person."[54]

*Id*. at 654–55.  Article I, Section 9 contains nothing but restrictions upon the power of the federal government; and its

---

[54]This was one of several clauses which Madison's proposal, in its fourth ("fourthly") section, called for to be inserted in art. I, § 9, between clauses 3 and 4, the others to be inserted there all being provisions which eventually became the First, Third, Fourth, Eighth and Ninth Amendments and portions of the Fifth and Sixth Amendments.

The other portions of what became the Fifth and Sixth Amendments, as well as what became the Seventh Amendment, Madison's proposal would have as additions to Article III, § 2.

Madison's proposal called for what became the Tenth Amendment to be (together with a separation of powers provision) in a new Article VII, with existing Article VII to be renumbered Article VIII.

Madison also proposed to amend Art. I, § 2, cl. 3 (number of representatives), Art. I, § 6, cl. 1 (compensation of representatives), and Art. I, § 10 (to prohibit states from denying equal rights of conscience, freedom of the press or jury trial in criminal cases).

Clauses 2 and 3 relate only to individual rights (habeas corpus, bill of attainder and ex post facto).

Madison's proposal was eventually submitted to a House committee of eleven members, of which Madison was one. That committee issued its report on July 28, 1789. The clause that would become the Second Amendment then read:

> "A well regulated militia, composed of the body of the people, being the best security of a free state, the right of the people to keep and bear arms shall not be infringed, but no person religiously scrupulous shall be compelled to bear arms." House of Representatives, Proceedings on Amendments, July 28, 1789 (*reprinted in* Young, *supra* note 34, at 680-82).

Thus, the philosophical declaration was moved to precede the substantive guarantee and "composed of the body of the people" was added just after "militia."

The House began its consideration of what would become the Second Amendment on August 17, 1789. Congressman Gerry moved to strike the religiously scrupulous exemption. *See* House of Representatives, Debate, August 17, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 695-99). This motion was defeated by a vote of 24-22; however, this language would later be dropped by the Senate. Opponents of the individual rights model find hope in the initial appearance of the religiously scrupulous exemption and comments made by Congressman Gerry in attempting to excise it. They argue that because "bear arms" has a military connotation in the religiously scrupulous clause, it necessarily carries the same

73

meaning in the substantive guarantee. This construction is supported, we are told, by Gerry's objection. Gerry feared that the federal government would use the clause to destroy the militia by declaring a large number of people religiously scrupulous and, therefore, ineligible for militia service. This would pave the way for oppression by the federal government's standing army.

> "This declaration of rights, I take it, is intended to secure the people against the mal-administration of the Government; if we could suppose that, in all cases, the rights of the people would be attended to, the occasion for guards of this kind would be removed. Now, I am apprehensive, sir, that this clause would give an opportunity to the people in power to destroy the constitution itself. They can declare who are those religiously scrupulous, and prevent them from bearing arms.
> What, sir, is the use of a militia? It is to prevent the establishment of a standing army, the bane of liberty. Now, it must be evident, that, under this provision, together with their other powers, Congress could take such measures, with respect to a militia, as to make a standing army necessary. Whenever governments mean to invade the rights and liberties of the people, they always attempt to destroy the militia, in order to raise an army upon their ruins."

*Id*. at 695-96. Gerry concluded by proclaiming, "[n]ow, if we give a discretionary power to exclude those from militia duty who have religious scruples, we may as well make no provision on this head."[55] The inference urged is that the only purpose of the

---

[55]Before the close vote was taken, Congressman Benson offered another rationale for striking the clause, and it was he who actually moved to strike. Benson believed there was no natural right to be exempted from military service and that such exemptions should be left to the "benevolence" of the legislature. House of Representatives, Debates, August 17, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 697).

substantive guarantee was to secure the right of militia members to bear arms in a military context. This interpretation of Gerry's statements appears somewhat strained. We think that Gerry's comments manifested his opinion that: 1) it takes a well regulated militia, not the mere private possession of firearms, to obviate the need for a standing army; and 2) an armed populace offers much less protection against a standing army than a well regulated militia. If Gerry saw any conflict between the amendment's substantive guarantee and the destruction of the militia which was supposedly enabled by the religiously scrupulous clause, he did not say so. In fact, Gerry's objection assumes that the amendment does not increase state power over the militia and that the preamble is but a philosophical declaration as to the necessity of a well regulated militia that does nothing to disturb Art. I, § 8, cl. 16, to which Gerry must be referring to as the source of the power of the federal government to destroy the militia. Gerry's concern was directed to the creation of a standing army; he does not express any worry that the feared purging of the rolls of the militia would enable the federal government to confiscate privately owned firearms, no doubt because the substantive guarantee applies to all the people, not just those that at a given time might comprise the militia. Properly understood, Gerry's remarks are not inconsistent with the individual rights view of the Second Amendment.

Gerry was not the only member of the First Congress to express

concern over the religiously scrupulous clause. Three days later, on August 20, 1789, Congressman Scott complained of it as well.

> "Mr. Scott objected to the clause in the sixth amendment, 'No person religiously scrupulous shall be compelled to bear arms.' He observed that if this becomes part of the constitution, such persons can neither be called upon for their services, nor can an equivalent be demanded; it is also attended with still further difficulties, for a militia can never be depended upon. This would lead to the violation of another article in the constitution, which secures to the people the right of keeping arms, and in this case recourse must be had to a standing army."

House of Representatives, Debates, August 20, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 703). Congressman Boudinot opposed striking the clause, in part because such action would imply the federal government is going to "compel all its citizens to bear arms." *Id.* The House ended up adding "in person" to the end of the clause. *Id.* We find no meaningful support, in Congressman Scott's statement, for either the states' rights or the sophisticated collective rights models. Scott was not concerned, as Gerry was, that the federal government would use the religiously scrupulous clause as a ruse to exclude everyone from militia service. Scott was worried that too many individual Americans would avail themselves of the clause's protection and that this would cause the militia to be so weakened that the federal government would have no choice but to maintain a standing army. It is not exactly clear where Scott found violation of the people's right to keep arms. The lack of a dependable militia both leads to

Scott's hypothetical violation and necessitates recourse to a standing army. It is possible that Scott found, in the amendment's philosophical declaration, some sort of right of the people to be free from a standing army.[56] In any case, this cryptic passage does not plainly lend support to any of the Second Amendment models. The only change that resulted from this discussion was the addition of the words "in person" at the end of the amendment and, as mentioned, the entire religiously scrupulous clause was later deleted by the Senate.

Congressman Burke repeatedly proposed that a clause be added to the amendment that would have required the consent of two-thirds of both houses of Congress to maintain a standing army in time of peace. This proposal was defeated by a margin of almost two to one. House of Representatives, Debates, August 17, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 697-98).

On August 24, 1789, the House completed its work on the proposed amendments and forwarded them to the Senate. At this time, the amendment read:

> "A well regulated militia, composed of the body of the people, being the best security of a free state, the right of the people to keep and bear arms, shall not be infringed, but no one religiously scrupulous of bearing arms, shall be compelled to render military service in person."

---

[56] If this was what Scott was thinking, he was wrong. As will be shown, proposals to limit the federal government's power to maintain a standing army were defeated in both the House and the Senate.

77

House of Representatives, Proceedings, August 24, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 707).

The Senate, which had the House action before it from August 25 through September 9, 1789, made three changes: 1) the words "composed of the body of the people" were stricken; 2) the words "the best" were replaced by "necessary to the"; and 3) the entire religiously scrupulous clause was stricken. *See* THE COMPLETE BILL OF RIGHTS 173-76 (Neil H. Cogan, ed., 1997). The Senate debates were conducted in secret, so there is no direct evidence of why these changes were made. The Senate rejected a proposed amendment to add the words "for the common defense" just after "the right of the people to keep and bear arms". *Id.* Like the House, the Senate rejected a proposed amendment that would have required the consent of two-thirds of both houses of Congress to maintain a standing army in time of peace. *Id.* The Senate on September 8, 1789 also refused to adopt an amendment that would have given the states power to arm and train their militias.[57]

---

[57]This rejected amendment read:

"That each state, respectively, shall have the power to provide for organizing, arming, and disciplining, its own militia, whensoever Congress shall omit or neglect to provide for the same; that the militia shall not be subject to martial law, except when in actual service, in time of war, invasion, or rebellion; and when not in the actual service of the United States, shall be subject only to such fines, penalties, and punishments, as shall be directed or inflicted by the laws of its own state." JOURNAL OF THE FIRST SESSION OF THE SENATE 75 (Washington, D.C. 1820).

In *Houston v. Moore*, 18 U.S. [5 Wheat] 1, 5 L.Ed. 19 (1820), the Supreme Court held that states retain the power to organize, arm, and discipline their militias provided that the exercise thereof is not

The most significant Senate action is the rejection of the amendment that would have granted the power of the states to arm and train their own militias.  This is, of course, the precise effect the states' rights model attributes to the Second Amendment. Proponents of that model argue that the rejection of that amendment simply indicates that this concern was already addressed, i.e. that the rejected amendment would have been mere surplusage.  This is highly implausible, particularly given the Second Amendment's placement within the Bill of Rights, its "the right of the people" language identical to that of the First and Fourth Amendments, and its lack of any reference to the power or rights of the states, all as contrasted to the direct and explicit state power language of the rejected amendment.  Moreover, this surplusage explanation also ignores that in the state conventions the right to keep and bear arms was always in the Bill of Rights section of proposed changes, while the state power to arm and train the militia was always in a

---

repugnant to the authority of the Union.  The Court reasoned that because the Constitution failed to divest the states of their preexistent militia powers, such powers remained.  *Id.* 5 L.Ed. at 22-23. The majority did not rely upon or even refer to the Second Amendment.

The only mention of the Second Amendment was by Justice Story in his dissent, wherein he observed that the Second Amendment probably did not have "any important bearing" on the question of whether states had power to organize, arm, and discipline their militias.  *Id*. 5 L.Ed. at 31.

It seems likely that if the Second Amendment was intended only to grant the states concurrent power to organize, arm, and discipline their militias, the Supreme Court would have relied, at least in part, upon the Second Amendment for its holding.  As it happened, the only mention of the Second Amendment was by the dissent in pointing out the Second Amendment's probable irrelevance to the state militia powers issue.

separate section or at least a separate article.

Not surprisingly, the significance of the Senate's other alterations or rejections is open to question. It could be argued that the striking of the words "composed of the body of the people" supports the sophisticated collective rights view that "militia" in the Second Amendment really means "select militia" and, therefore, pertains only to our modern national guard. However, there is an abundance of historical evidence that indicates the Anti-Federalists abhorred the idea of a select militia every bit as much as a standing army.[58] Clearly, if the

---

[58]*See* note 42, *supra*, and the following: John Smilie, Pennsylvania Convention, December 6, 1787 (*excerpts reprinted in* Young, *supra* note 34, at 145-46) ("I object to the power of Congress over the militia and to keep a standing army. . . . Congress may give us a select militia which will, in fact, be a standing army–or Congress, afraid of a general militia, may say there shall be no militia at all. When a select militia is formed, the people in general may be disarmed."); Centinel IX, Philadelphia INDEPENDENT GAZETTEER, January 8, 1788 (*excerpt reprinted in* Young, *supra* 192) (footnote omitted) ("I was ever jealous of the select militia, consisting of infantry and troops of horse, instituted in this city and some of the counties, . . . . Are not these corps provided to suppress the first efforts of freedom, and to check the spirit of the people until a regular and sufficiently powerful military force shall be embodied to rivet the chains of slavery on a deluded nation."); A Countryman, NEW YORK JOURNAL, January 22, 1788 (*excerpt reprinted in* Young, *supra* at 224) ("Should the new constitution be sufficiently corrected *by a substantial* bill of rights . . . separating the legislative, judicial and executive departments entirely, and confining the national government to its proper objects; but, by no means admitting a standing army in time of peace, nor a select militia, which last, is a scheme that a certain head has, for some time, been teeming with, and is nothing else but an artful introduction to the other . . . I imagine we might become a happy and respectable people."); AN ADDITIONAL NUMBER OF LETTERS FROM THE FEDERAL FARMER TO THE REPUBLICAN, Letter XVIII, May 1788 (*reprinted in* Young, *supra* at 354-55) (footnote omitted) ("First, the constitution ought to secure a genuine and guard against a select militia, by providing that the militia shall always be kept

Anti-Federalists believed the amendment offered any support for the formation of a select militia, or only recognized the right of members of the select militia to keep and bear arms while on active duty, they would have vociferously opposed it. It must be remembered that the entire goal of submitting amendments was to pacify, not infuriate, the Anti-Federalists. This suggests that the words "composed of the body of the people" were stricken as unnecessary surplusage.

The replacement of "best" with "necessary to the" strengthens the philosophical declaration's support for a militia. As the rejection of standing army amendments in the House and Senate, as well as subsequent history, show, even this bolder statement did not serve to limit the power of the federal government to maintain

well organized, armed, and disciplined, and include, according to the past and general usuage of the states, all men capable of bearing arms; and that all regulations tending to render this general militia useless and defenceless, by establishing select corps of militia, or distinct bodies of military men, not having permanent interests and attachments in the community to be avoided. . . . But, say gentlemen, the general militia are for the most part employed at home in their private concerns, cannot well be called out, or be depended upon; that we must have a select militia; that is, as I understand it, particular corps or bodies of young men, and of men who have but little to do at home, particularly armed and disciplined in some measure, at the public expence, and always ready to take the field. These corps, not much unlike regular troops, will ever produce an inattention to the general militia; and the consequence has ever been, and always must be, that the substantial men, having families and property, will generally be without arms, without knowing the use of them, and defenceless; whereas, to preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them; nor does it follow from this, that all promiscuously must go into actual service on every occasion. The mind that aims at a select militia, must be influenced by a truly anti-republican principle . . . .").

a large standing army.  Probably the only bearing this change has on the task before this Court is that it makes the sophisticated collective rights model's contention that "militia" really means national guard or "select militia" even more questionable.  Anti-Federalists would never have accepted that a select militia was the *best* security (or anything but a threat to) "a free state," much less *necessary* to the security of "a free state."

Opponents of the individual rights model claim the Senate refused to add "for the common defense" after the amendment's substantive guarantee because those words were unnecessary surplusage.  Given the amendment's text and history, which, almost without exception, support the individual rights view, we believe it much more likely that the Senate rejected this language because it potentially posed the risk of an interpretation contracting the substantive guarantee.

Finally, perhaps the least relevant Senate change is the deletion of the religiously scrupulous clause.  This may well have been because the Senate felt that the clause was not sufficiently germane to an amendment whose core purpose was to state the affirmative rights of individuals as opposed to limitations on their potential obligations, or, relatedly, that the clause dealt with a relatively minor, collateral matter which was not worth the controversy and/or confusion it had generated or could generate.  Or, the Senate might simply have felt (as did Congressman Benson,

see note 55 *supra*) this would be better left to the wisdom and discretion of a future Congress.

The House approved the Senate version of the amendment, and Congress forwarded it to the states along with the rest of the Bill of Rights on September 26, 1789.[59]

b.    Political Discourse

At the same time the above legislative history was being made, prominent Americans were writing in the newspapers and to each other.  These writings provide some insight into the nature (individual or collective) of the Second Amendment.

Anti-Federalist William Grayson expressed concern to fellow Anti-Federalist Patrick Henry that the only amendments that would be approved are those, like Madison's, that recognize individual rights:

> "I am exceedingly sorry it is out of my power to hold out to you any flattering expectations on the score of amendments; it appears to me that both houses are almost wholly composed of federalists; those who call themselves Antis are so extremely lukewarm as scarcely to deserve the appellation: Some gentlemen here from motives of policy have it in contemplation to effect amendments which shall effect personal liberty alone, leaving the great points of the judiciary, direct taxation &c, to stand as they are . . . .   Last Monday a string of amendments were presented to the lower House; these altogether respected personal liberty . . . ."

---

[59]Sent to the states at the same time were proposed amendments to Art. I, § 2, cl. 3 (number of representatives) and Art. I, § 6, cl. 1 (compensation of representatives).  Neither was ratified with the Bill of Rights, although the latter was (at least arguably) ultimately ratified as the Twenty-seventh Amendment in May 1992.

Letter from William Grayson to Patrick Henry (June 12, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 668-69).

Federalist Fisher Ames was pleased that Madison's amendments primarily concerned noncontroversial individual rights.

> "Mr. Madison has inserted, in his amendments, the increase of representatives, each State having two at least. The rights of conscience, of bearing arms, of changing the government, are declared to be inherent in the people. Freedom of the press, too. There is a prodigious great dose of medicine. But it will stimulate the stomach as little as hasty-pudding. It is rather food than physic. Am [sic] immense mass of sweet and other herbs and roots for a diet drink."

Letter from Fisher Ames to George Richards Minot (June 12, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 668).

Federalist Tench Coxe, in a widely republished article, described what would become the Second Amendment this way:

> "As civil rulers, not having their duty to the people, duly before them, may attempt to tyrannize, and as the military forces which shall be occasionally raised to defend our country, might pervert their power to the injury of their fellow-citizens, the people are confirmed by the next article in their right to keep and bear their private arms."

A Pennsylvanian [Federalist Tench Coxe], REMARKS *on the first part of the* AMENDMENTS *to the* FEDERAL CONSTITUTION, *moved on the 8th instant in the House of Representatives*, Philadelphia FEDERAL GAZETTE, June 18, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 671). That same day, Coxe wrote to Madison, discussing public reaction to Madison's proposed amendments and his own comments thereon which appeared in the *Federal Gazette*. *See* Young, *supra* note 34, at

672.  Madison responded:

> "Accept my acknowledgments for your favor of the 18th.
> instant.  The printed remarks inclosed in it are already
> I find in the Gazettes here.  It is much to be wished
> that the discon[ten]ted part of our fellow Citizens could
> be reconciled to the Government they have opposed, and by
> means as little as possible unacceptable to those who
> approve the Constitution in its present form.  The
> amendments proposed in the H. of Reps. had this twofold
> object in view; besides the third one of avoiding all
> controvertible points which might endanger the assent of
> 2/3 of each branch of Congs and 3/4 of the State
> Legislatures.  How far the experiment may succeed in any
> of these respects, is wholly uncertain.  It will however
> be greatly favored by explanatory strictures of a healing
> tendency, and is therefore already indebted to the co-
> operation of your pen."

Letter from James Madison to Tench Coxe (June 24, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 673-74).  Thus, consistent with his other statements, Madison seems to have endorsed Coxe's individual rights explanation of what would become the Second Amendment.  Note that Coxe made no mention of the philosophical declaration regarding a well regulated militia, but only referred to the provision's substantive guarantee and also that Coxe's reference to "private arms" is essentially inconsistent with both the states' rights and sophisticated collective rights models.

Opponents of the individual rights view dispute that Madison's letter was an endorsement of Coxe's explanation of the amendments, claiming that Madison disagreed with Coxe's explanation of the right of conscience.  In other words, they say that Madison was just being polite to Coxe for his attempt to explain the amendments and may not have agreed with all of the positions Coxe took.  Two

85

problems with this view are that there is no evidence that *anybody* disagreed with Coxe's explanation of the Second Amendment and that Madison's notes for his speech supporting the amendments indicate that they "relate 1st to private rights".  James Madison, *Notes for speech in Congress supporting Amendments* (June 8, 1789) (*reprinted in* Young, *supra* note 34, at 645).

Joseph Jones, in a letter to James Madison, wrote:

"I thank you for the copy of the amendments proposed to the constitution which you lately inclosed to me–they are calculated to secure the personal rights of the people so far as declarations on paper can effect the purpose, leaving unimpaired the great Powers of the government–they are of such a nature as to be generally acceptable and of course more likely to obtain the assent of Congress that wod. any proposition tending to separate the powers or lessen them in either branch."

Letter from Joseph Jones to James Madison (June 24, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 673).  Surely Mr. Jones would have distinguished an amendment that did not secure "personal rights."

Anti-Federalist Samuel Nasson recognized that the amendment guaranteed the right of individuals to keep arms for any lawful purpose.

"I find that Amendments are once again on the Carpet.  I hope that such may take place as will be for the Best Interest of the whole[.] *A Bill of rights* well secured that we the people may know how far we may Proceade in Every Department[,] then their [sic] will be no Dispute between the people and rulers[.] *[I]n that may be secured the right to keep arms for Common and Extraordinary Occasions such as to secure ourselves against the wild Beast and also to amuse us by fowling and for our Defence*

86

*against a Common Enemy[.]* [Y]ou know to learn the Use of arms is all that can Save us from a forighn foe that may attempt to subdue us[,] for if *we keep up the Use of arms and become well acquainted with them we Shall allway be able to look them in the face that arise up against us[,]* for it is impossible to Support a Standing armey large Enough to Guard our Lengthy Sea Coast[.]"

Letter from Samuel Nasson to George Thatcher (July 9, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 796-97) (emphasis added).

While Congressman Fisher Ames, a very strong Federalist, was pleased that Madison's amendments seemed unlikely to cause discord, he also expressed chagrin that the amendments were so focused on protecting the rights of the rabble that they did not belong in the Constitution.

"We have had the amendments on the *tapis*, and referred them to a committee of one from a State. I hope much debate will be avoided by this mode, and that the amendments will be more rational, and less *ad populum*, than Madison's. It is necessary to conciliate, and I would have amendments. But they should not be trash, such as would dishonor the Constitution, without pleasing its enemies. Should we propose them, North Carolina would accede. It is doubtful, in case we should not."

Letter from Fisher Ames to George Richards Minot (July 23, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 679).

Congressman William L. Smith viewed the Bill of Rights as recognizing individual rights, not the structure of government.

"The Committee on amendmts. have reported some, which are thought inoffensive to federalists & may do some good on the other side: N. Car[olin]a. only wants some pretext to come into the Union, & we may afford that pretext by recommending a few amendments.
There appears to be a disposition in our house to agree

87

to some, which will more effectually secure *private* rights, without affecting the structure of Govt."

Letter from William L. Smith to Edward Rutledge (August 9, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 798) (emphasis added).

Pennsylvania Congressman Frederick A. Muhlenberg believed the Bill of Rights would placate "our Minority in Pennsylvania."

"Altho' I am sorry that so much Time has been spent in this Business [the Bill of Rights], and would much rather have had it postponed to the next Session, yet as *it now is done I hope it will be satisfactory to our State, and as it takes in the principal Amendments which our Minority had so much at Heart,* I hope it may restore Harmony & unanimity amongst our fellow Citizens . . . ."

Letter from Frederick A. Muhlenberg to Benjamin Rush (August 18, 1789) (*excerpt reprinted in* Young, *supra* note 34, at 799) (emphasis added). Recall that the Pennsylvania Minority proposed what was indisputably an individual right to keep and bear arms.

Some Anti-Federalists were upset that Federalist James Madison was getting all the credit for proposing the Bill of Rights. They believed much of this credit was due Samuel Adams. Recall that Adams unsuccessfully proposed his own set of amendments to the Massachusetts Convention (and was much criticized for making the attempt).

"It may well be remembered that the following 'amendments' to the new constitution for these United States, were introduced to the convention of this commonwealth by its present Lieutenant Governor, that venerable patriot, SAMUEL ADAMS.–It was his misfortune to have been misconceived, and the proposition was accordingly withdrawn–lest the business of the convention

88

> (the session of which was then drawing to a period) might be unexpectedly protracted. His enemies triumphed exceedingly, and affected to represent his proposal as not only an artful attempt to prevent the constitution being adopted in this state, but as an unnecessary and improper alteration of a system, which did not admit of improvements. To the honor of this gentlemen's penetration, and of his just way of thinking on this important subject, every one of his intended alterations, but one, have been already reported by the committee of the House of Representatives in Congress, and most probably will be adopted by the federal legislature. In justice therefore to that long tried Republican, and his numerous friends, you gentlemen, are requested to re-publish his intended alterations, in the same paper that exhibits to the public, the amendments which the committee have adopted, in order that they may be compared together."

Letter from Mssrs. Adams & Nourse to the Editor of the Boston *Independent Chronicle*, Philadelphia INDEPENDENT GAZETTEER, August 20, 1789 (*reprinted in* Young, *supra* note 34, at 701-702). This is significant because Adams' amendments prohibited the Constitution from ever being construed to "prevent the people of the United States who are peaceable citizens, from keeping their own arms." *Id*. This language is not at all susceptible to the states' rights or sophisticated collective rights views.

Many Anti-Federalists supported the Bill of Rights, notwithstanding that it fell far short of delivering what they had fought for in the state conventions. But at least one famous Anti-Federalist was enraged that the amendments did not alter the balance of power between the federal and state governments, particularly as to control over the militia.

"What would be your opinion of the man who, living where

89

thieves were so numerous and vigilant as to improve every opportunity of plunder, should go to sleep at night in thoughtless security, with his doors wide open . . .

Similar would be the conduct of the people of the United States, if they rest the security of their invaluable privileges upon the partial amendments making by Congress to the new constitution: for although many of these amendments are very proper and necessary, yet whilst the constitution is suffered to retain powers that may not only defeat their salutary operation, but may, and incontrovertibly will be so decisively injurious as to sweep away every vestige of liberty; it is an insult upon the understanding and discernment of the people to flatter them with the secure enjoyment of privileges, that are held by so precarious and transient a tenure.

Besides, some of these limited, insecure amendments, which, to a superficial observer, seem to contain useful provisions, when examined with attention, are found to be delusive and inoperative. I will instance two or three of them.
....
Article 5th of the proposed amendments–'A well regulated militia, composed of the body of the people, being the best security of a free state, the right of the people to keep and bear arms, shall not be infringed, &c.' It is remarkable that this article only makes the observation, 'that a well regulated militia, composed of the *body* of the people, is the best security of a free state;' it does not ordain, or constitutionally provide for, the establishment of such a one. The absolute command vested by other sections in Congress over the militia, are not in the least abridged by this amendment. The militia may still be subjected to martial law and all its concomitant severities, and disgraceful punishments, may still be marched from state to state and made the unwilling instruments of crushing the last efforts of expiring liberty."

Centinel, Revived, No. XXIX, Philadelphia INDEPENDENT GAZETTEER, September 9, 1789 (*excerpt reprinted in* Young, *supra* note 34, at 711-12). Extreme Anti-Federalists like the Centinel would not be placated by mere recognition of a right about which the Federalists and Anti-Federalists were in agreement: the right of the people to

keep and bear arms.  In the Centinel's view, as long as the federal government had such extensive power over the militia, the people's liberties were not safe.  The Centinel simply rejected the Federalists repeated argument that there was no need to worry about a standing army as long as individuals were armed.  The Centinel also correctly observed that the amendment's preamble did nothing to alter the balance (or imbalance) of power between the state and federal governments as to the militia.

### 6.    19th Century Commentary

The great Constitutional scholars of the 19th Century recognized that the Second Amendment guarantees the right of individual Americans to possess and carry firearms.  We list their contributions in the order in which they were made.  First, St. George Tucker:

> "8. A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed.  Amendments to C.U.S. Art. 4.
> This may be considered as the true palladium of liberty. . . . The right of self defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible.  Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.  In England, the people have been disarmed, generally, under the specious pretext of preserving the game: a never failing lure to bring over the landed aristocracy to support any measure, under that mask, though calculated for very different purposes.  True it is, their bill of rights seems at first view to counteract this policy: but the right of bearing arms is confined to protestants, and the words suitable to their condition and degree, have

been interpreted to authorise the prohibition of keeping a gun or other engine for the destruction of game, to any farmer, or inferior tradesman, or other person not qualified to kill game. So that not one man in five hundred can keep a gun in his house without being subject to a penalty."

1 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES; AND OF THE COMMONWEALTH OF VIRGINIA, 300 (1803) (ellipsis in original). Note how the fact that the Second Amendment applies to Americans generally is sharply contrasted with, and favorably compared to, the relevant part of the English Bill of Rights, which only pertained to Protestants and even for those only as "suitable to their condition and degree." The Amendment is said to facilitate the right of self defense. Having individuals armed is particularly necessary when standing armies are kept up, as the combination of a standing army and a disarmed populace threatens the destruction of liberty.

Second, William Rawle:

"In the second article, it is declared, that a *well regulated militia is necessary to the security of a free state;* a proposition from which few will dissent. Although in actual war, the services of regular troops are confessedly more valuable; yet, while peace prevails, and in the commencement of a war before a regular force can be raised, the militia form the palladium of the country. They are ready to repel invasion, to suppress insurrection, and preserve the good order and peace of government. That they should be well regulated, is judiciously added. A disorderly militia is disgraceful to itself, and dangerous not to the enemy, but to its own country. The duty of the state government is, to adopt

92

such regulations as will tend to make good soldiers with the least interruptions of the ordinary and useful occupations of civil life. In this all the Union has a strong and visible interest.

The corollary, from the first position, is, that *the right of the people to keep and bear arms shall not be infringed*.

The prohibition is general. No clause in the Constitution could by any rule of construction be conceived to give to congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretence by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both.

In most of the countries of Europe, this right does not seem to be denied, although it is allowed more or less sparingly, according to circumstances. In England, a country which boasts so much of its freedom, the right was secured to protestant subjects only, on the revolution of 1688; and it is cautiously described to be that of bearing arms for their defence, 'suitable to their conditions, and as allowed by law.' An arbitrary code for the preservation of game in that country has long disgraced them. A very small proportion of the people being permitted to kill it, though for their own subsistence; a gun or other instrument, used for that purpose by an unqualified person, may be seized and forfeited. Blackstone, in whom we regret that we cannot always trace the expanded principles of rational liberty, observes however, on this subject, that the prevention of popular insurrections and resistence to government by disarming the people, is oftener meant than avowed, by the makers of forest and game laws.

This right ought not, however, in any government, to be abused to the disturbance of the public peace.

An assemblage of persons with arms, for an unlawful purpose, is an indictable offence, and even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace. If he refused he would be liable to imprisonment."

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 125-26

(Da Capo Press 1970) (2d ed. 1829) (footnotes omitted). This

explanation recognizes that the preamble is a declaration, a "proposition," setting forth the desirability of reliance upon a militia during peacetime. A well-regulated militia is the opposite of a disorderly, disgraceful militia. Rawle also observes that the Amendment's substantive guarantee applies to all Americans –"[t]he prohibition is general." He likewise makes plain that it precludes legislation "to disarm the people." Rawle, like St. George Tucker, makes clear that the Second Amendment does not suffer from the infirmities of the corresponding part of the English Bill of Rights.

Next, Justice Joseph Story:

"§ 1000. The next amendment is: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed.
§ 1001. The importance of this article will scarcely be doubted by any persons, who have duly reflected upon the subject. The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rulers. It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses, with which they are attended, and the facile means, which they afford to ambitious and unprincipled rulers, to subvert the government, or trample upon the rights of the people. *The right of the citizens to keep, and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers;* and *will generally,* even if these are successful in the first instance, *enable the people to resist,* and triumph over them. And yet, though this truth would seem so clear, and the importance of a well regulated militia would seem so undeniable, it cannot be disguised, that among the American people there is a growing indifference to any

94

system of militia discipline, and a strong disposition, from a sense of its burthens, to be rid of all regulations.  How it is practicable *to keep the people duly armed* without some organization, it is difficult to see.    There is certainly no small danger, that indifference may lead to disgust, and disgust to contempt; and thus gradually undermine all the protection intended by this clause of our national bill of rights."

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 708-709 (Carolina Academic Press 1987) (1833) (emphasis added).   Justice Story calls the right of "citizens" to keep and bear arms the "palladium" of our liberties.  He viewed the private ownership of firearms as reducing the need for the maintenance of large standing armies by promoting the vitality of the militia, and laments that militia participation is on the decline, fearing this will result in fewer Americans being armed.

And finally, Thomas Cooley:

"SECTION IV.—THE RIGHT TO KEEP AND BEAR ARMS
*The Constitution*.—By the second amendment to the Constitution it is declared that, 'a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed.'
The amendment, like most other provisions in the Constitutions, has a history.  It was adopted with some modification and enlargement from the English Bill of Rights of 1688, where it stood as a protest against arbitrary action of the overturned dynasty in disarming the people, and as a pledge of the new rulers that this tyrannical action should cease.  The right declared was meant to be a strong moral check against the usurpation and arbitrary power of rulers, and as a necessary and efficient means of regaining rights when temporarily overturned by usurpation.
*The Right is General*.—It might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by

95

the intent.  The militia, as has been elsewhere explained, consists of those persons who, under the law, are liable to the performance of military duty, and are officered and enrolled for service when called upon.  But the law may make provision for the enrolment of all who are fit to perform military duty, or of a small number only, or it may wholly omit to make any provision at all; and *if the right were limited to those enrolled, the purpose of this guaranty might be defeated altogether* by the action or neglect to act of the government it was meant to hold in check.  *The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms;* and they need no permission or regulation of law for the purpose.  But *this enables the government to have a well-regulated militia;* for to *bear arms implies something more than the mere keeping; it implies the learning to handle and use them* in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order.

*Standing Army*.—A further purpose of this amendment is, to preclude any necessity or reasonable excuse for keeping up a standing army.  A standing army is condemned by the traditions and sentiments of the people, as being as dangerous to the liberties of the people as the general preparation of the people for the defence of their institutions with arms is preservative of them.

*What Arms may be kept*.—The arms intended by the Constitution are such as are suitable for the general defence of the community against invasion or oppression, and the secret carrying of those suited merely to deadly individual encounters may be prohibited."

T HOMAS M. C OOLEY, T HE G ENERAL P RINCIPLES OF C ONSTITUTIONAL L AW IN THE U NITED

S TATES OF A MERICA 270-72 (Rothman & Co. 1981) (original ed. 1880)

(footnotes omitted) (emphasis added).

    7.    Analysis

The history we have recounted largely speaks for itself.  We

briefly summarize.  The Anti-Federalists desired a bill of rights,

96

express provision for increased state power over the militia, and a meaningful express limitation of the power of the federal government to maintain a standing army. These issues were somewhat interrelated. The prospect of federal power to render the militia useless and to maintain a large standing army combined with the absence of any specific guarantees of individual liberty frightened Anti-Federalists. But the Anti-Federalist complaint that resonated best with the people at large was the lack of a bill of rights.

In mid-1788 the Constitution was ratified unchanged and in the spring of 1789 the Federalists gained control of both houses of the First Congress. Hard-core Anti-Federalists persisted in all three demands, but more moderate Anti-Federalists and the people at large were primarily focused on securing a bill of rights. Most Federalists were not really averse to a bill of rights, but, like James Madison himself, had been forced to oppose any modifications to the Constitution since it could only be ratified unchanged. The Federalists wanted to please the Anti-Federalists as much as possible without fundamentally altering the balance of federal-state power. James Madison plainly stated this goal when he submitted his proposed amendments to the House.

Given the political dynamic of the day, the wording of the Second Amendment is exactly what would have been expected. The Federalists had no qualms with recognizing the individual right of all Americans to keep and bear arms. In fact, as we have

97

documented, one of the Federalists' favorite 1787-88 talking points on the standing army and federal power over the militia issues was to remind the Anti-Federalists that the American people were armed and hence could not possibly be placed in danger by a federal standing army or federal control over the militia. The Second Amendment's preamble represents a successful attempt, by the Federalists, to further pacify moderate Anti-Federalists without actually conceding any additional ground, i.e. without limiting the power of the federal government to maintain a standing army or increasing the power of the states over the militia.

This is not to say that the Second Amendment's preamble was not appropriate or is in any way marginal or lacking in true significance. Quite the contrary. Absent a citizenry generally keeping and bearing their own private arms, a militia as it was then thought of could not meaningfully exist. As pointed out by Thomas Cooley, the right of individual Americans to keep, carry, and acquaint themselves with firearms does indeed promote a well-regulated militia by fostering the development of a pool of firearms-familiar citizens that could be called upon to serve in the militia. While standing armies are not mentioned in the preamble, history shows that the reason a well-regulated militia was declared necessary to the security of a *free* state was because such a militia would greatly reduce the need for a standing army. Thus, the Second Amendment dealt directly with one of the Anti-

Federalists' concerns and indirectly addressed the other two. While the hard-core Anti-Federalists recognized that the Second Amendment did not assure a well-regulated militia or curtail the federal government's power to maintain a large standing army, they did not control either branch of Congress (or the presidency) and had to be content with the right of individuals to keep and bear arms.

Finally, the many newspaper articles and personal letters cited indicate that, at the time, Americans viewed the Second Amendment as applying to individuals. This is confirmed by the First Congress's rejection of amendments that would have directly and explicitly addressed the Anti-Federalists' standing army and power over the militia concerns.

We have found no historical evidence that the Second Amendment was intended to convey militia power to the states, limit the federal government's power to maintain a standing army, or applies only to members of a select militia while on active duty.[60] All of the evidence indicates that the Second Amendment, like other parts of the Bill of Rights, applies to and protects individual Americans.

We find that the history of the Second Amendment reinforces the plain meaning of its text, namely that it protects individual

---

[60]While there is no historical evidence that the states' rights view of the Second Amendment is correct, we are struck by the absence of any indication that the result contemplated by the sophisticated collective rights view was desired, or even conceived of, by anyone.

Americans in their right to keep and bear arms whether or not they are a member of a select militia or performing active military service or training.

E.    Second Amendment protects individual rights

We reject the collective rights and sophisticated collective rights models for interpreting the Second Amendment.  We hold, consistent with *Miller*, that it protects the right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms, such as the pistol involved here, that are suitable as personal, individual weapons and are not of the general kind or type excluded by *Miller*.  However, because of our holding that section 922(g)(8), as applied to Emerson, does not infringe his individual rights under the Second Amendment we will not now further elaborate as to the exact scope of all Second Amendment rights.

VI. Application to Emerson

The district court held that section 922(g)(8) was unconstitutionally overbroad because it allows second amendment rights to be infringed absent any express judicial finding that the person subject to the order posed a future danger.  In other words, the section 922(g)(8) threshold for deprivation of the fundamental

right to keep and bear arms is too low.[61]

Although, as we have held, the Second Amendment *does* protect individual rights, that does not mean that those rights may never be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country. Indeed, Emerson does not contend, and

---

[61]The district court's analysis of the constitutionality of section 922(g)(8), was essentially as follows:

"18 U.S.C. § 922(g)(8) is unconstitutional because it allows a state court divorce proceeding, without particularized findings of the threat of future violence, to automatically deprive a citizen of his Second Amendment rights. . . . All that is required for prosecution under the Act is a boilerplate order with no particularized findings. Thus, the statute has no real safeguards against an arbitrary abridgement of Second Amendment rights. Therefore, by criminalizing protected Second Amendment activity based upon a civil state court order with no particularized findings, the statute is over-broad and in direct violation of an individual's Second Amendment rights.

By contrast, § 922(g)(8) is different from the felon-in-possession statute, 18 U.S.C. § 922(g)(1), because once an individual is convicted of a felony, he has by his criminal conduct taken himself outside the class of law-abiding citizens who enjoy full exercise of their civil rights. Furthermore, the convicted felon is admonished in state and federal courts that a felony conviction results in the loss of certain civil rights, including the right to bear arms. This is not so with § 922(g)(8). . . .

It is absurd that a boilerplate state court divorce order can collaterally and automatically extinguish a law-abiding citizen's Second Amendment rights, particularly when neither the judge issuing the order, nor the parties nor their attorneys are aware of the federal criminal penalties arising from firearm possession after entry of the restraining order."

*United States v. Emerson*, 46 F.Supp.2d 598, 610-11 (N.D. Tex. 1999).

the district court did not hold, otherwise. As we have previously noted, it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms. See note 21, *supra.*[62] Emerson's argument that his Second Amendment rights have been violated is grounded on the propositions that the September 14, 1998 order contains no express finding that he represents a credible threat to the physical safety of his wife (or child), that the evidence before the court issuing the order would not sustain such a finding and that the provisions of the order bringing it within clause (C)(ii) of section 922(g)(8) were no more than uncontested boiler-plate. In essence, Emerson, and the district court, concede that had the order contained an express finding, on the basis of adequate evidence, that Emerson actually posed a credible threat to the physical safety of his wife, and had that been a genuinely contested matter at the hearing, with the parties and the court aware of section 922(g)(8), then Emerson could, consistent with the Second Amendment, be precluded from possessing

---

[62]Likewise, the Supreme Court has remarked that the right to keep and bear arms is, like other rights protected by the Bill of Rights, "subject to certain well-recognized exceptions, arising from the necessities of the case" and hence "is not infringed by laws prohibiting the carrying of concealed weapons," *Robertson v. Baldwin*, 17 S.Ct. 326, 329 (1897), or by laws "which only forbid bodies of men to associate together as military organizations . . . to drill or parade in cities and towns unless authorized by law." *Presser v. Illinois*, 6 S.Ct. 580, 584 (1886).

102

a firearm while he remained subject to the order.[63]

Though we are concerned with the lack of express findings in the order, and with the absence of any requirement for same in clause (C)(ii) of section 922(g)(8), we are ultimately unpersuaded by Emerson's argument. Section 922(g)(8)(A) requires an actual hearing with prior notice and an opportunity to participate, and section 922(g)(8)(C)(ii) requires that the order "explicitly" prohibit the use (actual, threatened or attempted) of physical force that would reasonably be expected to cause bodily injury. Congress legislated against the background of the almost universal rule of American law that for a temporary injunction to issue:

> "There must be a *likelihood* that irreparable harm will occur. Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant. Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. *A presently existing actual threat must be shown.* However, the injury need not have been inflicted when application is made or be certain to occur; *a strong threat* of irreparable injury before trial is an adequate basis." 9 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2948.1 at 153-56 (footnotes omitted; emphasis added).[64]

---

[63]Emerson does not contest that the prohibitions of the order fall within the literal terms of § 922(g)(8)(C)(ii), and the district court did not determine otherwise.

[64]*See also, e.g.,* 42 Am Jur 2d, Injunctions, § 32 at 606-08 ("To be entitled to an injunction, the plaintiff must establish that he . . . is *immediately in danger* of sustaining, some direct injury as a result of the challenged conduct. The injunction will not issue unless there is an imminent threat of illegal action. In other words, the injury or *threat of injury must be real and immediate* . . . The apprehension of injury must be well grounded, which means there is a *reasonable probability that a real injury . . . will occur if the injunction is not*

We conclude that Congress in enacting section 922(g)(8)(C)(ii) proceeded on the assumption that the laws of the several states were such that court orders, issued after notice and hearing, should not embrace the prohibitions of paragraph (C)(ii) unless such either were not contested or evidence credited by the court reflected a real threat or danger of injury to the protected party by the party enjoined. We do not imply that Congress intended to authorize collateral review of the particular state court predicate order in section 922(g)(8)(C)(ii) prosecutions to determine whether in that individual case the state court adequately followed state law in issuing the order. What we do suggest is that Congress did not have in mind orders issued under a legal system whose rules did not approximate the above stated general minimum standards for the issuance of contested injunctive orders after notice and hearing.

In any event, it is clear to us that Texas law meets these general minimum standards. *See, e.g., Texas Indus. Gas v. Phoenix Metallurgical*, 828 S.W.2d 529, 532 (Tex. App.-Hou. [1st Dist.] 1992):

> "A trial court may not issue a temporary injunction except to prevent a threatened injury. . . . The commission of the act to be enjoined must be more than just speculative, and the injury that flows from the act must be more than just conjectural. . . . The trial court

---

*granted . . .")* (footnotes omitted; emphasis added); *Id*. § 8 at 566 ("The standard for granting a preliminary injunction is essentially the same as for a permanent injunction, with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success") (footnote omitted).

> will abuse its discretion if it grants a temporary injunction when the evidence does not clearly establish that the applicant is threatened with an actual, irreparable injury."

*See also State v. Morales*, 869 S.W.2d 941, 946 (Tex. 1994) ("An injunction will not issue unless it is shown that the respondent will engage in the activity enjoined"); *Armendariz v. Mora*, 526 S.W.2d 542, 543 (Tex. 1975) (reversing temporary injunction where no "evidence establishing probable injury"); *Dallas General Drivers v. Wamix*, 295 S.W.2d 873, 879 (Tex. 1956); *In re Marriage of Spiegel*, 6 S.W.3d 643, 645 (Tex. App.–Amarillo 1999).

We conclude that essentially the same standards are applicable to orders, such as the September 14, 1998 order here, issued under Texas Family Code § 6.502, which provides that in a pending divorce proceeding "after notice and hearing, the court may render an appropriate order, including the granting of a temporary injunction for . . . protection of the parties as deemed necessary . . . including an order directed to one or both parties . . . prohibiting an act described by Section 6.501(a)." Section 6.501(a), dealing with temporary restraining orders in divorce proceedings, authorizes orders "prohibiting one or both parties from: . . . (2) threatening the other, by telephone or in writing, to take unlawful action against any person, intending by this action to annoy or alarm the other; . . . (4) intentionally, knowingly, or recklessly causing bodily injury to the other or to a child of either party; (5) threatening the other or a child of

105

either party with imminent bodily injury; . . ." The predecessor statute to section 6.502 has been construed as requiring a showing of "reasonable necessity" for the temporary injunction, including a showing of "a probable injury."  *See Florence v. Florence*, 388 S.W.2d 220, 223-24 (Tex. Civ. App.-Tyler 1965).

We are also somewhat troubled by the unavailability of review by direct appeal of interlocutory orders under section 6.502.  *See* Texas Family Code § 6.507.  However, appellate court review is available by mandamus under an "abuse of discretion" standard. *Wallace v. Briggs*, 348 S.W.2d 523, 527 (Tex. 1961).  There are a number of reported appellate court decisions granting such relief from orders under the predecessors to section 6.502.  *See, e.g., Wallace; Little v. Daggett*, 858 S.W.2d 368 (Tex. 1993); *Dancy v. Daggett*, 815 S.W.2d 548 (Tex. 1991); *Post v. Garza*, 867 S.W.2d 88 (Tex. App.-Corpus Christi 1993).  We also note that it has more generally been said that a "trial court will *abuse its discretion* if it grants a temporary injunction when the evidence does not clearly establish that the applicant is threatened with an actual, irreparable injury," *Texas Indus. Gas*, *supra*, 828 S.W.2d at 532 (emphasis added), and that, with reference to ruling on a temporary injunction application, "*[a]n abuse of discretion* arises when the trial court acts without reference to applicable guiding principles . . .; acts arbitrarily; . . . or misinterprets or misapplies the law. . . ."  *In Re Marriage of Spiegel*, 6 S.W.3d 643, 645 (Tex.

106

App.-Amarillo 1999) (emphasis added; citations omitted).  We also note in this connection that orders such as that here of September 14, 1998, expire on the final decree of divorce (and are subject to modification by the trial court prior thereto; if incorporated into the final divorce decree they are then subject to review on direct appeal).

In light of the foregoing, we cannot say that section 922(g)(8)(C)(ii)'s lack of a requirement for an explicit, express credible threat finding by the court issuing the order-of itself or together with appellate court review being available (prior to final judgment) only by mandamus-renders that section infirm under the Second Amendment.  The presence of such an explicit finding would likely furnish *some* additional indication that the issuing court properly considered the matter, but such findings can be as much "boilerplate" or in error as any other part of such an order.

As to Emerson's contention that the evidence before the court issuing the September 14, 1998 order was insufficient to show that he posed a credible threat to the physical safety of his wife or child, we conclude that under these circumstances *Lewis v. United States*, 100 S.Ct. 915 (1980) and our decision in *United States v. Chambers*, 922 F.2d 228 (5th Cir. 1991), each discussed in part I hereof above, necessarily preclude the court in the section 922(g)(8) prosecution from that sort of collateral review of the validity of the particular section 922(g)(8) predicate order, at

107

least where, as we hold to be the case here, the order is not so "transparently invalid" as to have "only a frivolous pretense to validity." *See Chambers* at 239.

With respect to temporary injunctions and similar orders to be issued only after notice and hearing, the Texas rule of law, as we have noted, is that such an order, at least to the extent contested and explicitly prohibiting acts such as are covered by section 922(g)(8)(C)(ii), may not properly issue unless the issuing court concludes, based on adequate evidence at the hearing, that the party restrained would otherwise pose a realistic threat of imminent physical injury to the protected party, and this is so regardless of whether or not Texas law requires the issuing court to make on the record express or explicit findings to that effect. Moreover, such orders are subject to being set aside by the issuing court as well as being subject to some review by an appellate court. In such a case, we conclude that the nexus between firearm possession by the party so enjoined and the threat of lawless violence, is sufficient, though likely barely so, to support the deprivation, while the order remains in effect, of the enjoined party's Second Amendment right to keep and bear arms, and that this is so even though the party enjoined may not collaterally attack the particular predicate order in the section 922(g)(8) prosecution, at least so long as the order, as here, is not so transparently invalid as to have only a frivolous pretense to

108

validity.[65]

VII. Conclusion

Error has not been demonstrated in the district court's refusal to dismiss the indictment on commerce clause grounds.

For the reasons stated, we reverse the district court's order granting the motion to dismiss the indictment under the Fifth Amendment.

We agree with the district court that the Second Amendment protects the right of individuals to privately keep and bear their own firearms that are suitable as individual, personal weapons and are not of the general kind or type excluded by *Miller*, regardless of whether the particular individual is then actually a member of a militia.[66] However, for the reasons stated, we also conclude that

---

[65]As previously observed, see note 6, *supra*, the present record does not confront us with and we do not speak to, a situation in which the defendant's firearm possession is merely incident to (and/or is simply passive pending initiation and completion of) a good faith effort to rid himself, as soon after issuance of the disqualifying court order as reasonably practicable under the circumstances, of the continued possession of a previously possessed firearm.

[66]We reject the special concurrence's impassioned criticism of our *reaching* the issue of whether the Second Amendment's right to keep and bear arms is an individual right. That precise issue was decided by the district court and was briefed and argued by both parties in this court and in the district court. Moreover, in reaching that issue we have only done what the vast majority of other courts faced with similar contentions have done (*albeit* our *resolution* of that question is different). The vast majority have *not*, as the special concurrence would have us do, simply said it makes no difference whether or not the Second Amendment right to keep and bear arms is an individual right because even if it were an individual right the conviction (or the challenged statute) would be valid. In this case, unless we were to determine the

109

the predicate order in question here is sufficient, albeit likely minimally so, to support the deprivation, while it remains in effect, of the defendant's Second Amendment rights. Accordingly, we reverse the district court's dismissal of the indictment on Second Amendment grounds.

We remand the cause for further proceedings not inconsistent herewith.

REVERSED and REMANDED[67]

issue of the proper construction of section 922(g)(8) in Emerson's favor (which the special concurrence does *not* suggest), resolution of this appeal *requires* us to determine the *constitutionality* of section 922(g)(8), facially and as applied, under the Second Amendment (as well as under the due process clause and the commerce clause). We have done so on a straightforward basis.

We likewise reject the implied criticism (in the special concurrence's fourth paragraph) for not mentioning certain "facts" not alleged in the indictment, not found to be true by any trier of fact, and not relevant to the section 922(g)(8) violation alleged. The district court dismissed the indictment and Emerson has not yet been convicted of anything. In fact, we have been informed that he has been *acquitted* of state charges relating to the matter mentioned in the special concurrence.

[67]All pending undisposed motions are denied.

110

**Appendix**

The material in this appendix comes largely from Young, "The Origin of the Second Amendment" (2d ed. 1995) (Golden Oaks Books), hereinafter cited as Young (all emphasis in original unless otherwise noted).

1. *Anti-Federalists want a Bill of Rights.*

Letter from Richard Henry Lee to William Shippen, Jr. (October 2, 1787) (*reprinted in* Young, at 31)("I have considered the new Constitution . . . & I find it impossible for me to doubt, that in its present State, unamended, the adoption of it will put Civil Liberty and the happiness of the people at the mercy of Rulers who may possess the great unguarded powers given . . . The necessary alterations will by no means interfere with the general nature of the plan, or limit the power of doing good; but they will restrain from oppression the wicked & Tyrannic . . . ."); Letter from George Mason to George Washington (October 7, 1787) (*reprinted in* Young, at 34-35) ("Objections to the Constitution of Government formed by the Convention. There is no Declaration of Rights, and the Laws of the general Government being paramount to the Laws & Constitutions of the several States, the Declarations of Rights in the separate States are no Security."); An Old Whig II, PHILADELPHIA INDEPENDENT GAZETTEER, October 17, 1787 (*excerpts reprinted in* Young, at 49-51) ("*[T]he future Congress will be fully authorized to assume all such powers as they in their wisdom or wickedness, according as the one or the other may happen to prevail, shall from time to time think proper to assume.* . . . [I]t is not of a farthing consequence whether they really are of opinion that the law is necessary and proper, or only *pretend to think so;* for who can overrule their pretensions?–No one, unless we had a bill of rights to which we might appeal . . . In giving such immense, such unlimited powers, was there no necessity of a bill of rights to secure to the people their liberties?"); Letter from Elbridge Gerry to the Massachusetts General Court (October 18, 1787) (*excerpt reprinted in* Young, at 51) ("My principal objections to the plan, are . . . that the system is without the security of a bill of rights."); An Old Whig III, PHILADELPHIA INDEPENDENT GAZETTEER, October 20, 1787 (*excerpt reprinted in* Young, at 51) ("[T]here ought to be a bill of rights firmly established, which neither treaties nor acts of the legislature can alter."); Letter from Louis Guillaume Otto to Comte

111

de Montmorin (October 21, 1787) (excerpt *reprinted in* Young, at 56) ("He [Anti-Federalist Richard Henry Lee] disapproves especially that the government might have been accorded immense powers without preceding the Constitution with a *bill of rights*, which has always been regarded as the palladium of a free people."); A Confederationalist, Philadelphia Pennsylvania Herald, October 27, 1787 (*excerpt reprinted in* Young, at 66) ("[A] declaration of those inherent and political rights ought to be made in a BILL OF RIGHTS, that the people may never lose their liberties by construction."); Letter from George Lee Turberville to Arthur Lee (October 28, 1787) (excerpt *reprinted in* Young, at 71) ("[T]his points out to me the absolute necessity of a bill of rights–and that a very full & explanatory one too–where not only the Liberty of the press, the trial by jury of the vicinage & all those great points–but even every the most trivial privilege that Citizens have a right to possess–shou'd be expressly stipulated and reserved–& the violation of them most scrupulously and Jealously guarded against–Of what consequence is the federal guarantee of republican governments to the individual states, when the power of the Militia's even is rested in the president . . . ."); Letter from Arthur Lee to Edward Rutledge (October 29, 1787) (*excerpt reprinted in* Young, at 72) ("I do not like it [the Constitution].  The want of a promised declaration of rights, when by some exceptions in the Body of it, things, in which no power is expressly given, implies that every thing not excepted is given; is a very material defect.); R.S., Philadelphia Pennsylvania Herald, November 10, 1787 (*excerpt reprinted in* Young, at 101) ("The most repeated, and certainly the most substantial, charge against the proposed constitution, is the want of a bill of rights."); Brutus III, New York Journal, November 15, 1787 (*excerpt reprinted in* Young, at 104) ("[T]he plan [the Constitution] is radically defective in a fundamental principle, which ought to be found in every free government; to wit, a declaration of rights."); Robert Whitehill, Pennsylvania Convention, November 28, 1787 (*excerpt reprinted in* Young, at 117) ("If indeed the Constitution itself so well defined the powers of government that no mistake could arise, and we were well assured that our governors would always act right, then we might be satisfied without an explicit reservation of those rights with which the people ought not, and mean not to part.  But, sir, we know that it is the nature of power to seek its own augmentation, and thus the loss of liberty is the necessary consequence  of a loose or extravagant delegation of authority. National freedom has been, and will be the sacrifice of ambition and power, and it is our duty to employ the present opportunity in stipulating such restrictions as are best calculated to protect us from oppression and slavery."); A Federal Republican, A Review of the Constitution (November 28, 1787) (*excerpt reprinted in* Young, at 119) ("Hitherto we have been considering the blemishes of the Constitution as they statedly

exist–other objects are derived from omission.  Among these the grand one, upon which is indeed suspended every other, is the omission of a bill of rights."); Letter from Thomas Jefferson to James Madison (December 20, 1787) (*excerpt reprinted in* Young, at 177) ("[A] bill of rights is what the people are entitled to against every government on earth, general or particular, & what no just government should refuse, or rest on inference."); Letter from Thomas B. Waite to George Thatcher, January 8, 1788 (*excerpt reprinted in* Young, at 194) ("There is a certain darkness, duplicity and studied ambiguity of expression running thro' the whole Constitution which renders a Bill of Rights peculiarly necessary.–As it now stands but very few individuals do, or ever will understand it.–Consequently, Congress will be its own *interpreter* . . . ."); Samuel, Boston Independent Chronicle, January 10, 1788 (*excerpt reprinted in* Young, at 202) ("The most complaints, that I have heard made about the proposed Constitution, are that there is no declaration of rights."); Hugh Henry Brackenridge, Pittsburgh Gazette, March 1, 1788 (*excerpt reprinted in* Young, at 291) ("The want of a *bill of rights* is the great evil."); Luther Martin, Baltimore Maryland Journal, March 21, 1788 (*excerpts reprinted in* Young, at 306) ("But the proposed constitution being intended and empowered to act not only on states, but also immediately on individuals, it renders a recognition and a stipulation in favour of the rights both of states and of men, not only proper, but in my opinion, *absolutely* necessary."); Patrick Henry, Virginia Convention, June 16, 1788  (*excerpt reprinted in* Young, at 436) ("[T]he necessity of a bill of rights appears to me to be greater in this government than ever it was in any government before.").

And, there were moderates who sought to make peace between the Federalists and Anti-Federalists and recognized the necessity of a Bill of Rights.  *See* A True Friend, Broadside: Richmond, December 6, 1787 (*reprinted in* Young, at 143) ("Let us then insert in the first page of this constitution, as a preamble to it, a declaration of our rights, or an enumeration of our prerogatives, as a sovereign people; that they may never hereafter be unknown, forgotten or contradicted by our representatives, our delegates, our servants in Congress . . . .").

2.  *Federalists say bill of rights not needed because federal government given no power to infringe fundamental rights.*

One of the People, Philadelphia Pennsylvania Gazette, October 17, 1787 (*excerpt reprinted in* Young, at 45) ("The freedom of the press and trials by jury are not infringed on.  The Constitution is silent, and with propriety too, on these and every other subject

relative to the internal government of the states. These are secured by the different state constitutions. I repeat again, that the Federal Constitution does not interfere with these matters. Their power is defined and limited by the 8th section of the first Article of the Constitution, and they have not power to take away the freedom of the press, nor can they interfere in the smallest degree with the judiciary of any of the states."); A Citizen, CARLISLE GAZETTE, October 24, 1787 (*excerpt reprinted in* Young, at 57) ("The consideration of the nature and object of this general government will also shew you how weak it is to talk of a bill of rights in it. It is a government of states; not of individuals. The constitution of each state has a bill of rights for its own citizens; and the proposed plan guaranties to every state a republican form of government for ever. But it would be a novelty indeed to form a bill of rights for states."); James Wilson, Pennsylvania Convention, November 28, 1787 (*excerpt reprinted in* Young, at 114) ("[A] bill of rights is by no means a necessary measure. In a government possessed of enumerated powers, such a measure would be not only unnecessary, but preposterous and dangerous."); Brutus, Alexandria VIRGINIA JOURNAL, December 6, 1787 (*excerpt reprinted in* Young, at 144) ("The powers which the people delegate to their rulers are completely defined, and if they should assume more than is there warranted they would soon find that there is a power in the United States of America paramount to their own, which would bring upon them the just resentment of an injured people."); Cassius XI, Boston MASSACHUSETTS GAZETTE, December 25, 1787 (*excerpt reprinted in* Young, at 179) ("[O]f what use would be a bill of rights, in the present case? . . . It can only be to resort to when it is supposed that Congress have infringed the unalienble rights of the people: but would it not be much easier to resort to the federal constitution, to see if therein power is given to Congress to make the law in question? If such power is not given, the law is in fact a nullity, and the people will not be bound thereby. For let it be remembered that such laws, and such only, as are founded on this constitution, are to be the supreme laws of the land."); General Charles Pinckney, South Carolina Convention, January 18, 1788, (*excerpt reprinted in* Young, at 217) ("The general government has no powers but what are expressly granted to it; it therefore has no power to take away the liberty of the press. . . . [T]o have mentioned it in our general Constitution would perhaps furnish an argument, hereafter, that the general government had a right to exercise powers not expressly delegated to it. For the same reason, we had no bill of rights inserted in our Constitution; for, as we might perhaps have omitted the enumeration of some of our rights, it might hereafter be said we had delegated to the general government a power to take away such of our rights as we had not enumerated . . . ."); Aristides [Alexander Contee Hanson], REMARKS ON THE PROPOSED PLAN OF A FEDERAL

114

GOVERNMENT, ADDRESSED TO THE CITIZENS OF THE UNITED STATES OF AMERICA, AND PARTICULARLY TO THE PEOPLE OF MARYLAND, January 31, 1788 (*excerpts reprinted in* Young, at 239-42) ("[W]hen the compact [the Constitution] ascertains and defines the power delegated to the federal head, then cannot this government, without manifest usurpation, exert any power not expressly, or by *necessary* implication, conferred by the compact. This doctrine is so obvious and plain, that I am amazed any good man should deplore the omission of a bill of rights."); Alexander White, Winchester VIRGINIA GAZETTE, February 22, 1788 (*excerpts reprinted in* Young, at 281) ("There are other things [in the Pennsylvania Minority's proposed Declaration of Rights] so clearly out of the power of Congress, that the bare recital of them is sufficient, I mean the 'rights of conscience, or religious liberty-the *rights of bearing arms for defence, or for killing game*-the liberty of fowling, hunting and fishing-the right of altering the laws of descents and distribution of the effects of deceased persons and titles of lands and goods, and the regulation of contracts in the individual States.' These things seem to have been inserted among their objections, merely to induce the ignorant to believe that Congress would have a power over such objects and to infer from their being refused a place in the Constitution, their intention to exercise that power to the oppression of the people. But if they had been admitted as reservations out of the powers granted to Congress, it would have opened a large field indeed for legal construction: I know not an object of legislation which by a parity of reason, might not be fairly determined within the jurisdiction of Congress.") (emphasis added).


3. *Federalists argue that bill of rights may imply federal government has power to infringe those rights not mentioned.*

James Wilson, Pennsylvania Convention, November 28, 1787 (*excerpt reprinted in* Young, at 116) ("In all societies, there are many powers and rights, which cannot be particularly enumerated. A bill of rights annexed to a constitution is an enumeration of the powers reserved. If we attempt an enumeration, every thing that is not enumerated is presumed to be given. The consequence is, that an imperfect enumeration would throw all implied power into the scale of the government; and the rights of the people would be rendered incomplete."); Jasper Yeates, Pennsylvania Convention, November 30, 1787 (*excerpt reprinted in* Young, at 125-26) ("I agree with those gentlemen who conceive that a bill of rights, according to the ideas of the opposition, would be accompanied with considerable difficulty and danger; for, it might be argued at a future day by the persons then in power-you undertook to enumerate the rights which you meant to reserve, the pretension which you now

115

make is not comprised in that enumeration, and, consequently, our jurisdiction is not circumscribed."); Brutus, Alexandria VIRGINIA JOURNAL, December 6, 1787 (*excerpt reprinted in* Young, at 144) ("[I]t would therefore have been not only absurd but even dangerous to have inserted a bill of rights; because, if, in the enumeration of rights and privileges to be reserved, any had been omitted or forgotten, and the people, at a future period, should assume those so omitted, the rulers might with propriety dispute their right to exercise them, as they were not specified in the bill of rights . . . .").


4. *Federalists argue bill of rights not needed as Americans, used to freedom, would not allow infringement of rights.*

Letter from William Pierce to St. George Tucker (September 28, 1787) (*reprinted in* Young, at 29 ("I set this down as a truth founded in nature, that a nation habituated to freedom will never remain quiet under an invasion of its liberties."); A CITIZEN OF PHILADELPHIA [Pelatiah Webster], THE WEAKNESS OF BRUTUS EXPOSED, November 8, 1787 (*reprinted in* Young, at 85) ("[S]hould they [Congress] assume tyrannical powers, and make incroachments on liberty without the consent of the people, they would soon attone for their temerity, with shame and disgrace, and probably with their heads."); The State Soldier, Richmond VIRGINIA INDEPENDENT CHRONICLE, January 16, 1788 (*excerpt reprinted in* Young, at 209) ("[T]here is nothing in this constitution itself that particularly bargains for a surrender of your liberties, it must be your own faults if you become enslaved. Men in power may usurp authorities under any constitution–and those they govern may oppose their tyranny."); Marcus, NORFOLK AND PORTSMOUTH JOURNAL, March 12, 1788 (*excerpt reprinted in* Young, at 297-98) ("It is in the power of the Parliament if they dare to exercise it, to abolish the trial by jury altogether–but woe be to the man who should dare to attempt it–it would undoubtedly produce an insurrection that would hurl every tyrant to the ground who attempted to destroy that great and just favorite of the English nation. We certainly shall be always sure of this guard at least, upon any such act of folly or insanity in our Representatives: They soon would be taught the consequence of sporting with the feelings of a free people."); Publius [Alexander Hamilton], *The Federalist, No. 8*, THE NEW YORK PACKET, November 20, 1787 (*excerpt reprinted* in Young, at 105-06) (footnote omitted) ("The smallness of the army renders the natural strength of the community an overmatch for it; and the citizens, not habituated to look up to the military power for [protection], or to submit to its oppressions, neither love nor fear the soldiery: They view them with a spirit of jealous acquiescence in a necessary evil, and stand ready to resist a power which they suppose may be

exerted to the prejudice of their rights. The army under such circumstances, may usefully aid the magistrate to suppress a small faction, or an occasional mob, or insurrection; but it will be unable to enforce encroachments against the united efforts of the great body of the people.").


5. *Federalists argue that federal power to maintain a standing army should not be feared because the American people are armed and hence could resist an oppressive standing army.*

A CITIZEN OF AMERICA [Federalist Noah Webster], AN EXAMINATION INTO THE LEADING PRINCIPLES OF THE FEDERAL CONSTITUTION (October 10, 1787) (*reprinted in* Young, at 40) ("Before a standing army can rule, the people must be disarmed; as they are in almost every kingdom in Europe. The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretense, raised in the United States."); *Essay on Federal Sentiments*, PHILADELPHIA INDEPENDENT GAZETTEER, October 23, 1787 (*excerpt reprinted in* Young, at 57) ("If the president and the whole senate should happen to be the boldest wealthiest, most artful men in the union, supported by the most powerful connexions, and unanimous in the design of subduing the nation; and if by the concurrence of the representatives they obtained money and troops for the purpose; yet the whole personal influence of Congress, and their parricide army could never prevail over an hundred thousand men armed and disciplined, owners of the country, animated not only with a spirit of liberty, but ardent resentment against base treacherous tyrants."); Mr. Sedgwick, Massachusetts Convention, January 24, 1788 (*excerpt reprinted in* Young, at 230-31) ("It was, he said, a chimerical idea to suppose that a country like this could ever be enslaved. How is an army for that purpose to be obtained from the freemen of the United States? They certainly, said he, will know to what object it is to be applied. Is it possible, he asked, that an army could be raised for the purpose of enslaving themselves and their brethren? [O]r if raised, whether they could subdue a nation of freemen, who know how to prize liberty, and who have arms in their hands?"); Aristides [Alexander Contee Hanson], REMARKS ON THE PROPOSED PLAN OF A FEDERAL GOVERNMENT, ADDRESSED TO THE CITIZENS OF THE UNITED STATES OF AMERICA, AND PARTICULARLY TO THE PEOPLE OF MARYLAND, January 31, 1788 (*excerpt reprinted in* Young, at 240) ("If indeed it be possible in the nature of things, that congress shall, at any future period, alarm us by an improper augmentation of troops, could we not, in that case, depend on the militia, which is ourselves."); A Pennsylvanian III [Tench Coxe], Philadelphia PENNSYLVANIA GAZETTE, February 20, 1788 (*excerpt reprinted in* Young, at 275-76) ("The power of the sword, say the minority of

Pennsylvania is in the hands of Congress. My friends and countrymen, it is not so, for THE POWERS OF THE SWORD ARE IN THE HANDS OF THE YEOMANRY OF AMERICA FROM SIXTEEN TO SIXTY. The militia of these free commonwealths, entitled and accustomed to their arms, when compared to any possible army must be *tremendous and irresistable*. Who are these militia? *[A]re they not our selves*. Is it feared, then, that we shall turn our arms *each man against his own bosom*. Congress have no power to disarm the militia. Their swords, and every other terrible implement of the soldier, are *the birthright of an American*. What clause in the state or foedral constitution hath *given away* that important right. . . . I do not hesitate to affirm, that the unlimited power of the sword is not in the hands of either the *foedral or state governments*, but, where I trust in God it will ever remain, *in the hands of the people*."); Foreign Spectator, REMARKS *on the Amendments to the federal Constitution, proposed by the Conventions of Massachusetts, New-Hampshire, New-York, Virginia, South and North-Carolina, with the minorities of Pennsylvania and Maryland, by a* FOREIGN SPECTATOR, Number VI, Philadelphia FEDERAL GAZETTE, November 7, 1788 (*excerpt reprinted in* Young, at 556) ("We proceed to consider the amendments that regard the military power of the federal government. . . . While the people have property, arms in their hands, and only a spark of a noble spirit, the most corrupt congress must be mad to form any project of tyranny."); The Republican, Hartford CONNECTICUT COURANT, January 7, 1788 (*excerpts reprinted in* Young, at 188-91) ("it is a capital circumstance in favor of our liberty that the people themselves are the military power of our country. In countries under arbitrary government, the people oppressed and dispirited neither possess arms nor know how to use them. Tyrants never feel secure until they have disarmed the people. They can rely upon nothing but standing armies of mercenary troops for the support of their power. But the people of this country have arms in their hands; they are not destitute of military knowledge; every citizen is required by law to be a soldier; we are all marshaled into companies, regiments, and brigades, for the defense of our country. This is a circumstance which increases the power and consequence of the people; and enables them to defend their rights and privileges against every invader. . . . The spirit of the people would oppose every open and direct attempt to enslave them.").

Madison expresses largely the same thought in *Federalist* No. 46, as follows: "Extravagant as the supposition is, let it, however, be made. Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government; still it would not be going too far to say that the State governments with the people on their side would

be able to repel the danger.  The highest number to which, according to the best computation, a standing army can be carried in any country does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms.  This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men.  To these would be opposed *a militia amounting to near half a million citizens with arms in their hands*, officered by men chosen from among themselves, fighting for their common liberties and united and conducted by governments possessing their affections and confidence.  It may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops.  Those who are best acquainted with the last successful resistance of this country against the British arms will be most inclined to deny the possibility of it.  Besides *the advantage of being armed, which the Americans possess over the people of almost every other nation*, the existence of subordinate governments, to which the people are attached and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of.  Notwithstanding the military establishments *in the several kingdoms of Europe*, which are carried as far as the public resources will bear, *the governments are afraid to trust the people with arms*. . . . Let us not insult the free and gallant citizens of America with the suspicion, that they would be less able to defend the rights of which they would be in actual possession, than the debased subjects of arbitrary power [Europeans] would be to rescue theirs from the hands of their oppressors." (*The Federalist Papers*, Rossiter, New American Library, at 299-300; emphasis added).


6.  *Federalists argue that federal militia powers obviated the need for and minimized the likelihood of there being a large standing army*.

In *Federalist* No. 29 Hamilton states:  "If a well-regulated militia be the most natural defense of a free country, it ought certainly to be under the regulation and at the disposal of that body which is constituted the guardian of national security.  If standing armies are dangerous to liberty, an efficacious power over the militia in the same body ought, as far as possible, to take away the inducement and the pretext to such unfriendly institutions.  If the federal government can command the aid of the militia in those emergencies which call for the military arm in support of the civil magistrate, it can better dispense with the employment of a different kind of force.  If it cannot avail itself of the former, it will be obliged to recur to the latter.  To

119

render an army unnecessary will be a more certain method of preventing its existence than a thousand prohibitions upon paper." (*The Federalist Papers*, Rossiter, New American Library, at 183). *See also* James Madison, Virginia Convention, June 14, 1788 (*excerpt reprinted in* Young, at 400, 402, 404): "If insurrections should arise, or invasions should take place, the people ought unquestionably to be employed, to suppress and repel them, rather than a standing army. The best way to do these things was to put the militia on a good and sure footing, and enable the government to make use of their services when necessary. . . . [After a response by George Mason] The most effectual way to guard against a standing army, is to render it unnecessary. The most effectual way to render it unnecessary, is to give the general government full power to call forth the militia, and exert the whole natural strength of the Union, when necessary. . . . If you limit their [the federal government's] power over the militia, you give them a pretext for substituting a standing army."

ENDRECORD

ROBERT M. PARKER, Circuit Judge, specially concurring:

I concur in the opinion except for Section V. I choose not to join Section V, which concludes that the right to keep and bear arms under the Second Amendment is an individual right, because it is dicta and is therefore not binding on us or on any other court. The determination whether the rights bestowed by the Second Amendment are collective or individual is entirely unnecessary to resolve this case and has no bearing on the judgment we dictate by this opinion. The fact that the 84 pages of dicta contained in Section V are interesting, scholarly, and well written does not change the fact that they are dicta and amount to at best an advisory treatise on this long-running debate.

As federal judges it is our special charge to avoid constitutional questions when the outcome of the case does not turn on how we answer. *See Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."); *Walton v. Alexander*, 20 F.3d 1350, 1356 (5th Cir. 1994)(Garwood, J., concurring specially)("It is settled that courts have a strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the

121

parties to the case under consideration.")(internal quotations omitted). Following this cardinal rule, we will not, for example, pick and choose among dueling constitutional theories when under any construction the challenged provision is invalid. *See Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 621 n.11 (1985). Nor will we decide a constitutional question when under any construction the challenged provision must be sustained. *See O'Connor v. Nevada*, 27 F.3d 357, 361 (9th Cir. 1994); *Bullock v. Minnesota*, 611 F.2d 258, 260 (8th Cir. 1979). Furthermore, the fact that a trial court passed on a novel question of constitutional law does not require us to do likewise. Appellate courts are supposed to review judgments, not opinions. *See Texas v. Hopwood*, 518 U.S. 1033, 1033 (1996). Here, whether "the district court erred in adopting an individual rights or standard model as the basis for its construction of the Second Amendment," Maj. Op. at 23, is not a question that affects the outcome of this case no matter how it is answered. In holding that § 922(g)(8) is not infirm as to Emerson, and at the same time finding an individual right to gunownership, the majority today departs from these sound precepts of judicial restraint.

No doubt the special interests and academics on both sides of this debate will take great interest in the fact that at long last some court has determined (albeit in dicta) that the Second Amendment bestows an individual right. The real issue, however,

-122-

is the fact that whatever the nature or parameters of the Second Amendment right, be it collective or individual, it is a right subject to reasonable regulation. The debate, therefore, over the nature of the right is misplaced. In the final analysis, whether the right to keep and bear arms is collective or individual is of no legal consequence. It is, as duly noted by the majority opinion, a right subject to reasonable regulation. If determining that Emerson had an individual Second Amendment right that could have been successfully asserted as a defense against the charge of violating § 922(g)(8), then the issue would be cloaked with legal significance. As it stands, it makes no difference. Section 922(g)(8) is simply another example of a reasonable restriction on whatever right is contained in the Second Amendment.

And whatever the scope of the claimed Second Amendment right, no responsible individual or organization would suggest that it would protect Emerson's possession of the other guns found in his military-style arsenal the day the federal indictment was handed down. In addition to the Beretta nine millimeter pistol at issue here, Emerson had a second Beretta like the first, a semi-automatic M-1 carbine, an SKS assault rifle with bayonet, and a semi-automatic M-14 assault rifle. Nor would anyone suggest that Emerson's claimed right to keep and bear arms supercedes that of his wife, their daughter, and of others to be free from bodily harm or threats of harm. Though I

see no mention of it in the majority's opinion, the evidence shows that Emerson pointed the Beretta at his wife and daughter when the two went to his office to retrieve an insurance payment. When his wife moved to retrieve her shoes, Emerson cocked the hammer and made ready to fire. Emerson's instability and threatening conduct also manifested itself in comments to his office staff and the police. Emerson told an employee that he had an AK-47 and in the same breath that he planned to pay a visit to his wife's boyfriend. To a police officer he said that if any of his wife's friends were to set foot on his property they would "be found dead in the parking lot."

If the majority was only filling the *Federal Reporter* with page after page of non-binding dicta there would be no need for me to write separately. As I have said, nothing in this case turns on the original meaning of the Second Amendment, so no court need follow what the majority has said in that regard. Unfortunately, however, the majority's exposition pertains to one of the most hotly-contested issues of the day. By overreaching in the area of Second Amendment law, the majority stirs this controversy without necessity when prudence and respect for *stare decisis* calls for it to say nothing at all. *See* CASS R. SUNSTEIN, ONE CASE AT A TIME: JUDICIAL MINIMALISM AND THE SUPREME COURT 5 (1999)("[A] minimalist path usually--not always, but usually--makes a good deal of sense *when the Court is dealing with a constitutional*

*issue of high complexity about which many people feel deeply and on which the nation is divided (on moral or other grounds)."*) (italics in original).  Indeed, in the end, the majority today may have done more harm than good for those who embrace a right to gunownership.